IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| JOSEPH F. FRANKL, Regional Director of Region 20 of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, | ) ) ) ) ) ) | CIV. NO. 11-00451JMS/RLP<br><br>ORDER GRANTING THE PETITION FOR INJUNCTION UNDER SECTION 10(J) OF THE NATIONAL LABOR RELATIONS ACT |
| Petitioner, | ) ) | |
| vs. | ) ) | |
| HTH CORPORATION, PACIFIC BEACH CORPORATION and KOA MANAGEMENT, LLC, A Single Employer, d/b/a PACIFIC BEACH HOTEL, | ) ) ) ) ) ) | |
| Respondents. | ) ) | |
| _____ | ) | |

## ORDER GRANTING THE PETITION FOR INJUNCTION UNDER SECTION 10(J) OF THE NATIONAL LABOR RELATIONS ACT

## I. __INTRODUCTION__

Once again, the court addresses the National Labor Relations Board's (the "Board") allegations that Waikiki's Pacific Beach Hotel (the "Hotel") has engaged in unfair labor practices. And once again, the court agrees that the Hotel has engaged in unfair labor practices.

The parties in this action are no strangers to each other, much less to this court. For nearly a decade, the Board has filed numerous complaints asserting

that HTH Corp. ("HTH"), Pacific Beach Corp. ("PBC"), and Koa Management, LLC ("Koa") d/b/a/ the Hotel (collectively, "Respondents") have engaged in a litany of violations of the National Labor Relations Act (the "NLRA" or the "Act") -- for meddling with, failing to recognize, and refusing to negotiate with the International Longshore and Warehouse Union, Local 142, AFL-CIO (the "Union"). In each action, the Board has found that Respondents did indeed commit various violations of the Act, and this court has already entered one injunction preventing Respondents from violating the Act and requiring them to take certain affirmative steps. The court now enters its second injunction in less than two years, and, in a separate order, finds Respondents in contempt for violating the court's previous injunction.

In this action, Petitioner Joseph F. Frankl, Director of Region 20 of the Board ("Petitioner") asserts that Respondents have once again violated the Act by disciplining and terminating employee Rhandy Villanueva ("Villanueva") to discourage Union activities, making unilateral changes to the policy of allowing Union representatives access to the Hotel, making unilateral changes to conditions of employment, and refusing to give requested information to the Union.[1] On

---

[1] Petitioner asserts that Respondents have violated the following provisions of the NRLA, 29 U.S.C. § 158(a), making it an unfair labor practice:

> (1) to interfere with, restrain, or coerce employees in the exercise

(continued...)

September 13, 2011, Administrative Law Judge John J. McCarrick ("ALJ

McCarrick"), after hearing sixteen days of testimony, issued a Decision finding

that Respondents committed various violations of the NLRA, and Respondents

have appealed the ALJ Decision to the Board.  *See HTH Corp.*, 2011 WL 4073681

(NLRB Sept. 13, 2011).

      In the meantime, Petitioner has sought interim injunctive relief from

this court pursuant to § 10(j) of the NLRA, 29 U.S.C. § 160(j) (referred to herein

as "§ 10(j)").  Specifically, Petitioner requests that the court issue an injunction

ordering Respondents to, among other things, reinstate Villanueva, bargain in good

faith with the Union, and provide requested information.  Respondents object to

the Petition, arguing that they have not violated the Act and injunctive relief is not

otherwise warranted.  Based on the following, the court GRANTS the § 10(j)

Petition.

--------

[1](...continued)
of the rights guaranteed in section 157 of this title;
. . .
(3)  by discrimination in regard to hire or tenure of employment or
any term or condition of employment to encourage or discourage
membership in any labor organization . . . [and]
. . .
(5) to refuse to bargain collectively with the representatives of his
employees, subject to the provisions of section 159(a) of this title.

## II.  **BACKGROUND**[2]

Since the beginning of its drive to organize the Hotel's employees in 2002, the Union has faced opposition from Respondents.  A July 31, 2002 election was overturned by the Board due to Respondents' coercive interrogation of employees and maintenance of an overly broad no-solicitation policy.  *HTH Corp.*, 342 NLRB 372 (2004).  In a second election on August 24, 2004, Respondents challenged several ballots, resulting in the Board ordering those ballots to be counted and the Union winning the election by one vote.  *Pacific Beach Corp.*, 344 NLRB 1160 (2005).  On August 15, 2005, the Regional Director issued a certificate of representation in favor of the Union.

After the Union was certified, Respondents continued their campaign to derail the Union, forcing Petitioner to file Complaints against Respondents from 2007 through 2008, which resulted in a September 30, 2009 decision by ALJ James M. Kennedy finding that Respondents had committed numerous NLRA violations, followed by a June 14, 2011 affirmance by the Board.  *See HTH Corp.*, 356 NLRB No. 182, 2011 WL 2414720 (2011).  While waiting for the Board decision, Petitioner filed a Petition for § 10(j) relief, which this court granted on

---

[2]  Because the facts regarding each alleged violation of the Act are detailed and specific, the court provides in the Background Section only a general overview of the parties and their previous disputes.  The court outlines in the Discussion section the facts and evidence regarding each alleged violation.

March 29, 2010 (the "March 29, 2010 Injunction"), *see Norelli v. HTH Corp.*, 699 F. Supp. 2d 1176 (D. Haw. 2010), and which was affirmed on July 13, 2011. *Frankl v. HTH Corp.*, 650 F.3d 1334 (9th Cir. 2011).

After the March 29, 2010 Injunction, Petitioner filed a new Complaint against Respondents with the NLRB, and also sought contempt sanctions in this court for alleged violations of the March 29, 2010 Injunction (addressed in a separate order). On September 13, 2011, ALJ McCarrick issued his Decision finding that Respondents committed various violations of the NLRA. *See HTH Corp.*, 2011 WL 4073681.

In the meantime, on July 20, 2011, Petitioner filed the present Petition seeking a § 10(j) injunction pending the final Board decision. Respondents filed their Opposition on September 19, 2011, and Petitioner filed its Reply on October 3, 2011. A hearing was held on October 31, 2011.

## III.  STANDARD OF REVIEW

The Board may petition a federal district court "for appropriate temporary relief or restraining order" pending the Board's resolution of an unfair labor practice charge, and the district court has "jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper." 29 U.S.C. § 160(j).

In determining a motion for temporary relief pursuant to § 10(j), the court must "consider the traditional equitable criteria used in deciding whether to grant a preliminary injunction [] and employ the Supreme Court's recent interpretation of the threshold showing necessary for granting such an 'extraordinary remedy.'" *McDermott v. Ampersand Publ'g, LLC*, 593 F.3d 950, 957 (9th Cir. 2010) (quoting *Winter v. Natural Res. Def. Council*, 129 S. Ct. 365, 374-76 (2008)); *see also Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) ("A preliminary injunction is an extraordinary and drastic remedy [that] is never awarded as of right." (citation and quotation signals omitted)). "Thus, when a Regional Director seeks § 10(j) relief, he 'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Frankl*, 650 F.3d at 1355 (quoting *Winter*, 555 U.S. at 374); *see also McDermott*, 593 F.3d at 957. "'[S]erious questions going to the merits' and a balance of hardships that tips sharply towards the [Regional Director] can support issuance of a preliminary injunction, so long as the [Regional Director] also shows that there is a likelihood of irreparable harm and that the injunction is in the public interest.'" *Frankl*, 650 F.3d at 1355 (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)

(alterations in *Frankl*).  The Regional Director must nonetheless "establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction."  *Id.* (quoting *Alliance for the Wild Rockies*, 632 F.3d at 1131).

The court must consider these factors "through the prism of the underlying purpose of section 10(j), which is to protect the integrity of the collective bargaining process and to preserve the Board's remedial power."  *Id.* (quoting *Scott v. Stephen Dunn & Assocs.*, 241 F.3d 652, 661 (9th Cir. 2001)).

## IV.  DISCUSSION

Petitioner asserts that the court should issue the requested injunction because he will likely succeed on the merits before the Board and the Ninth Circuit, the Union and Hotel employees will suffer irreparable harm in the absence of preliminary relief, the balance of equities tips in favor of injunctive relief, and an injunction is in the public interest.  The court considers the arguments on each of these inquiries.

### A.  Likelihood of Success on the Merits

"On a § 10(j) petition, likelihood of success is a function of the probability that the Board will issue an order determining that the unfair labor practices alleged by the Regional Director occurred and that [Ninth Circuit] would grant a petition enforcing that order, if such enforcement were sought."  *Frankl*,

650 F.3d at 1355-56 (citing *McDermott*, 593 F.3d at 964).  Likelihood of success is proven in § 10(j) cases where there is "some evidence to support the unfair labor practice charge together with an arguable legal theory."  *Id.* at 1356 (quoting *Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 460 (9th Cir. 1994) (en banc)); *see also Stephen Dunn & Assocs.*, 241 F.3d at 664 (quotations omitted).  Alternatively, "if the Director does not show that success is likely, and instead shows only that there are serious questions going to the merits, then he must show that the balance of hardships tilts sharply in his favor, as well as showing that there is irreparable harm and that the injunction is in the public interest."  *Frankl*, 650 F.3d at 1356 (citing *Alliance for the Wild Rockies*, 632 F.3d at 1135).

Further, where the "Director seeks and receives approval from the NLRB before filing a § 10(j) petition,[3] the Director is owed special deference because 'likelihood of success is a function of the probability that the Board will issue an order determining that the unfair labor practices alleged by the Regional Director occurred.'"  *Small v. Avanti Health Sys., LLC*, --- F.3d ----, 2011 WL 5120538, at *4 (9th Cir. Oct. 31, 2011) (quoting *Frankl*, 650 F.3d at 1355).  In other words, "[t]hat the NLRB 'itself decided to file a Section 10(j) petition might

_____

[3]  During the October 31, 2011 hearing, both parties agreed that the Board, not the Board's General Counsel, authorized the filing of the instant § 10(j) Petition.

signal its future decision on the merits, assuming the facts alleged in the petition withstand examination at trial.'" *Id.* (quoting *McDermott*, 594 F.3d at 964).[4]

Petitioner asserts that Respondents have committed a number of NLRA violations;[5] the court addresses each in turn.

### 1.    Discharge of Villanueva

Petitioner asserts that Respondents' termination of Villanueva violated sections 8(a)(1) and (3) of the Act, which, as relevant to this case, prohibit employers from interfering with, restraining or coercing employees in the exercise of their collective bargaining rights, or from discriminating in regard to tenure of employment to discourage membership in a labor organization, respectively.  29 U.S.C. §§ 158(a)(1) & (a)(3).  The court first outlines the evidence regarding these allegations, and then determines whether Petitioner has established a likelihood of success in proving this claim.

---

[4]  The court also recognizes that because the ALJ is "the Board's first-level decisionmaker" and has "presided over the merits hearing, the ALJ's factual and legal determinations supply a useful benchmark against which the Director's prospects of success may be weighed."  *Small v. Avanti Health Sys., LLC*, --- F.3d ----, 2011 WL 5120538, at *3 (9th Cir. Oct. 31, 2011) (quoting *Bloedern v. Francisco Foods, Inc*., 276 F.3d 270, 288 (7th Cir. 2001).  As explained below, even independent of ALJ McCarrick's Decision, Petitioner has established a likelihood of success on the merits.

[5]  Petitioner also asserts that HTH, PBC, and Koa are a single employer.  At the October 31, 2011 hearing, Respondents conceded this point.

*a.      Facts*

Villanueva was employed at the Hotel from May 1993 to November 30, 2007, and again from April 12, 2010 to July 28, 2010. Joint Ex. A at 102. Starting in 2003 until he was terminated in 2007, Villanueva served as a Housekeeper II working the day shift, which entailed delivering linens, answering guest calls, supporting the room attendant, and picking up trash at the end of the shift. *Id.* at 102-03, 106-07, 113, 185. Both before and after his 2007 termination, Villanueva was an active Union participant -- he served as one of the original members of the Union negotiating committee, attended negotiating sessions between the Hotel and Union, attended Union meetings, and spoke with Hotel employees about the Union. *Id.* at 111-12.

The March 29, 2010 Injunction found that Petitioner established a likelihood of success in proving that Respondents violated the Act by discharging Villanueva for his Union participation, and therefore ordered Respondents to reinstate him. *Norelli*, 699 F. Supp. 2d at 1198-99, 1207. As a result, on April 12, 2010, Respondents reinstated Villanueva as a Housekeeper II on the evening shift, with duties including cleaning and servicing rooms and delivering linen, towels, and other supplies to the housekeepers' supply closets. Joint Ex. A at 113. In comparison to his previous duties, Villanueva had not restocked the  housekeepers'

supply closets since 2003 and had never cleaned rooms.  *Id.* at 113-14.  As to

training for his new duties, Villanueva shadowed a Houseman for one day, after

which Villanueva worked alone.  *Id.* at 116-17.

Shortly after his reinstatement, Villanueva was disciplined for his

failure to follow various unwritten rules, which resulted in his termination on July

28, 2010.[6]

           i.      Placement of cases of toilet paper/production log incident

On May 20, 2010, Villanueva received a "written verbal warning"

from Human Resource Manager Margaret Yang ("Yang") regarding his failure to

properly store a case of toilet paper on April 27, 2010, and his failure to properly

complete his production log during the first week of May 2010.  *Id.* at 146-48.

As to the storage of the case of toilet paper, on April 27, 2010,

Villanueva had placed the case on the top shelf of a housekeepers' closet while he

was re-stocking.  *Id.* at 127-28, 432.  The top shelf is 60 and 5/8 inches from the

floor, and the case of toilet paper weighs 37 pounds, is 23 inches wide, 17 inches

---

[6] Although Petitioner and Respondents outline the facts regarding a "written verbal warning" and suspension that Villanueva received, the Petition is limited to asserting that Petitioner has a strong likelihood of establishing that Respondents violated the Act by discharging Villanueva; it does not assert that the earlier disciplinary events constitute violations of the Act.  *See* Doc. No. 1, ¶ 11(c).  At the October 31, 2011 hearing, Petitioner explained that although all the disciplinary events constitute violations of the Act, he is seeking injunctive relief only as to the termination.  Because the earlier disciplinary events are nonetheless relevant to Villanueva's discharge, the court outlines and analyzes all relevant facts below.

high, and 18 inches deep. *Id.* at 53, 307. On April 28, 2010, Executive

Housekeeper Christine Ko ("Ko"), Housekeeping Supervisor Bobby Hind

("Hind"), and Housekeeping Manager Sandy Lam ("Lam") notified Villanueva

that when delivering toilet paper, he must not place it on the top shelf because it is

not safe. *Id*. at 127-29, 432. Villanueva explained that he had done so because

there was no room on the bottom shelf, and he did not want to leave the case on the

floor next to the bottom shelf, which would block the housekeeper's cart. *Id.* at

129, 143, 335-36. During the April 28, 2010 meeting, Ko told Villanueva that in

the future, if there is no room on the bottom shelf, he should make a notation on

the supply form and not deliver the case of toilet paper. *Id.* at 131-32. Villanueva

was not told that he would be disciplined and did not again place cases of toilet

paper on the top shelf of the housekeepers' closets. *Id.* at 133, 135.

According to Villanueva, prior to the April 28, 2010 meeting with Ko,

Lam, and Hind, he was not given any kind of written or verbal policy or procedure

explaining where items should be stored in the housekeepers' closets; nor was he

told that he should not place the box of toilet paper on the top shelf. *Id.* at 130,

135, 137. Further, both Villanueva and housekeeper Cherlene Saulin Wong

testified that they recalled seeing a case of toilet paper on the top shelf in other

housekeepers' closets on at least one occasion each. *Id.* at 135-36, 347-48. In

comparison, Lam testified that Housemen are familiar with the practice of putting heavy items on the bottom shelf and are given instructions on how to stock the closets at the time of hiring.  *Id.* at 907; *see also id.* at 847-48 (housekeeper Lolita Lucas testifying that the toilet paper is always placed on the floor of the closet); 1044 (Houseman Larry Edrada ("Edrada") testifying that he places the toilet paper on the floor of the closet for safety reasons).

As to Villanueva's failure to properly complete his production log,[7] during the first week of May 2010, Ko told Villanueva that instead of placing checkmarks next to the room numbers he had completed servicing on his production log, he should record the times he entered and exited a room.  *Id.* at 144.  Again, Villanueva had never been instructed to record the time he entered and exited a room in his production log and had no indication that he was going to be disciplined for his failure to properly complete the production log.  *Id.* at 126-27, 143-44.  After receiving these instructions regarding his production log from Ko, Villanueva complied.  *Id.* at 541-42; Joint Ex. B at GC14.

Despite the fact that Villanueva had not violated any written rules and was not told of these "oral" rules before he was accused of violating them, on May

---

[7]  A production log is a card an employee fills out while on shift documenting each particular room visited, the reason for the visit (*e.g.*, provide towels, service the room), and the times of the service.  *See, e.g.*, Joint Ex. B at GC Ex. 14; *see also* Joint Ex. A at 121 (Villanueva testifying that the production log is a small blue card which is "like a job order").

20, 2010, Villanueva received a written verbal[8] warning for "violation of safety rules" and "failure to observe operating policies, procedures, and/or standards." Joint Ex. B at GC3, p. 2. During this May 20, 2010 meeting, Union Business Agent Karl Lindo ("Lindo") asked why Hotel management had waited so long to issue the warning and the rationale behind the warning, especially given that Yang and Ko had already instructed Villanueva as to the proper placement of cases of toilet paper, and Villanueva had followed their instructions. Joint Ex. A at 432. Ko responded that management wanted to put the warning in writing. *Id.* at 433. When Lindo asked Yang and Ko whether the warning was Hotel general manager Robert Minicola's ("Minicola") decision -- who was fully aware of Villanueva's Union activity and has spearheaded Respondents' efforts to derail the Union -- neither responded. *Id.*

ii.    Unauthorized access into the housekeeping office

After receiving the written verbal warning, Villanueva was involved in another incident regarding his access to the locked housekeeping office.

The housekeeping office stores various items such as employee contact information and personnel files, work schedules, assignment logs, and

_____

[8] Although the "action taken" is identified as a "verbal warning," the warning is in writing.

14

guests' lost and found items, and is locked after 8:00 p.m.  *Id.* at 909-10.  On July

5, 2010, while working his 3:00 p.m. to 11:00 p.m. shift, Villanueva responded to

an employee call reporting that a guest had complained of a cockroach inside a

hotel room.  *Id.* at 157.  Villanueva went to the security desk where the keys for the

housekeeping office were kept, and asked Safety and Security Manager Eric

Hangai ("Hangai") for the keys so that he could retrieve "disinfectant."  *Id.* at 158-

59.  Although Villanueva did not say he needed to retrieve bug spray, Villanueva

speaks English as a second language and has consistently referred to sprays as

"disinfectant."  *Id.* at 150, 159-60, 228; *see also* Joint Ex. B at GC14, p. 42

(reflecting that on July 3, 2010, Villanueva wrote in his production log, "spray

disinfectant (Roaches).");  GC20, p. 3 (explaining to Minicola that he used

"disinfectant" on roaches).  Further, just two days prior on July 3, 2010, Villanueva

had accessed the security office to obtain bug spray without incident.  Joint Ex. A

at 154-56; Joint Ex. B at GC14, p. 42.  On that occasion, the Manager on Duty

("MOD") called Villanueva, notifying him about a cockroach in a guest room and

told him to go to security to request access to the locked housekeeping office to

obtain bug spray.  Joint Ex. A at 155-56.  Villanueva went to security officer

Bartolome, who handed him the key, and Villanueva used the key to unlock the

security office, get the spray, and used the spray on the cockroach.  *Id.*  Villanueva

then logged the use of the spray on his July 3, 2010 production log.  *Id.* at 156; Joint Ex. B at GC14, p. 42.

According to Hangai, although there is no written policy, he learned through his work as a security officer that entry into the housekeeping office after it was locked was allowed only by the MOD to access the lost and found.  Joint Ex. A at 644-45.  Housekeeping manager Lam also testified that Villanueva was not authorized to access the locked housekeeping office, and housekeeper Roselind Mad ("Mad") and Edrada further explained that Housemen have no reason to enter the locked housekeeping office because all the housekeeping supplies (which apparently do not include bug spray) are kept in closets on each floor.  *Id.* at 915, 1004, 1052-53.  Because Villanueva referred to the bug spray as "disinfectant," however, Hangai testified that he assumed a chemical was needed for an emergency cleanup and did not contact the MOD before opening the housekeeping office.  *Id.* at 640-41.

Hangai accompanied Villanueva to the housekeeping office, unlocked the office and let Villanueva inside, observing that Villanueva went directly to the cabinet and took a spray can.  *Id.* at 647.  Although Hangai looked at the spray can before allowing Villanueva to leave with it, he testified that he did not notice that it

was an insecticide[9] and did not ask Villanueva what the spray was for.  *Id.* at 648.

After giving the spray can back to Villanueva, Hangai asked if Villanueva needed

to log that he was taking the spray can; Villanueva responded that there was no log

for the spray can.  *Id.* at 161, 649.  Hangai therefore made a notation in the security

log regarding the entry into the housekeeping office.  *Id.* at 661-62; *see also* Joint

Ex. B at GC15, p. 3.

Villanueva testified that after entering the guest room and spraying the

cockroach, he placed the spray can in his black housekeeping bag along with his

keys and radio at the end of his shift, and dropped the bag off at the housekeeping

office before clocking out, as he does at the end of every shift.  Joint Ex. A at 266-

67, 286-87.  Villanueva testified that he placed the spray can in the housekeeping

bag because he felt Ko was watching him and thought that the bag was the safest

place to leave the spray.  *Id.* at 409-10.

The next day, on July 6, 2010, Hangai informed Ko that Villanueva

had entered the office and removed a spray can of "565 Plus," and that Hangai had

secured the office after Villanueva left.  *Id.* at 1173.  Ko said she was not aware of

Villanueva's entry and would look into it.  *Id.*

---

[9]  The bug spray can was labeled "565 PLUS XO" in large letters with the phrase
"Contact Insecticide" appearing in smaller letters directly under it.  Joint Ex. B at GC12,
GC12(a).

On July 7, 2010, Ko notified Hangai that the spray can was missing from the housekeeping office. *Id.* at 1173-74. She also notified Hangai, after calling the manufacturer Orkin, that the "disinfectant" was commercial-grade insecticide, and that an employee had to be trained to use it, which Villanueva was not. *Id.* at 1175-77.

   iii. The July 12, 2010 suspension and the July 28, 2010 termination

On July 12, 2010, Ko notified Villanueva that he was being suspended without pay, pending an investigation. Although Villanueva asked Ko why he was being suspended, Ko did not give Villanueva any specifics. *Id.* at 149.

On July 20, 2010, the Union and Hotel held an investigatory meeting, which was attended by Villanueva, Union representatives Brian Tanaka ("Tanaka") and Eadie Omonaka ("Omonaka"), Minicola, Yang, Ko, and note keeper Lan Yao. *Id.* at 1278-79; *see also* Joint Ex. C at Resp't Ex. 15. The meeting started by Tanaka asking Minicola to explain the subject matter of the Hotel's investigation of Villanueva, Joint Ex. B at GC20, p. 1; Joint Ex. C at Resp't Ex. 15, p. 1, to which Minicola responded that Villanueva was suspended pending investigation regarding an infraction that occurred on July 5, 2010 and that they would not discuss the nature of the infractions at this point. Joint Ex. B at GC20, p. 1.

Minicola proceeded to ask Villanueva a series of questions including

18

whether anything unusual happened on his shift on July 5, 2010, whether

Villanueva asked security for the key to the housekeeping office, and how many

times he had accessed the housekeeping office since starting work on the night

shift.  Joint Ex. A at 1281-83; Joint Ex. B at GC20, pp. 1-2; Joint Ex. C at Resp't

Ex. 15, pp. 1-3.  Villanueva explained that he obtained access to the housekeeping

office to spray a cockroach with "disinfectant" in a guest room, that the MOD,

Mad, had instructed him to spray cockroaches on other occasions, and that he had

previously gained access to the housekeeping office.  Joint Ex. B at GC20, pp. 1-3.

Indeed, had Minicola reviewed Villanueva's production log, he would have seen

that Villanueva had sprayed "disinfectant" and/or serviced rooms for insects on at

least five occasions between April 21 and July 5, 2010.  Joint Ex. B at GC14, p. 12

("spray tub for ants"), 25 ("spray disinfectant"), 32 ("cacaroach [sic]"), 42 ("spray

disinfectant (Roaches)"), 45 ("spray dis/bugs").  Further, although not asked at this

meeting, Villanueva testified before ALJ McCarrick that he was unaware of any

requirement that he receive authorization to gain access to the housekeeping office

and that he had not dealt with a locked housekeeping office during his previous

tenure working the day shift.  Joint Ex. A at 172-73.

       Minicola next asked Ko about the normal procedure for employees to

access the locked housekeeping office, and she answered that employees are

supposed to see the MOD and/or call a manager, and that requests for access occur infrequently and only for emergencies. Joint Ex. B at GC20, p. 3. Ko further explained that Villanueva did not call a MOD on July 5 or leave a note, and that Villanueva was not trained to use the bug spray. *Id.* Minicola then brought Hangai into the meeting and asked him questions about what happened when Villanueva accessed the housekeeping office and whether Hangai thought the events of July 5, 2010 were unusual. *Id.* at p. 4. Hangai responded that he thought it was unusual that Villanueva requested access to the locked housekeeping office because usually only a supervisor or manager can make this request. *Id.* at 5. Omonaka also asked Hangai why he did not follow the purported proper procedure regarding access to the housekeeping office, and Hangai provided no response. *Id.* at p. 4; Joint Ex. A at 785-86.

At the conclusion of the meeting, Minicola stated that Villanueva was not logging what he was taking, that Villanueva should not be accessing the office, and that Villanueva may have stolen the can of bug spray. Joint Ex. B at GC20, p. 6. Minicola asserted that he was particularly concerned about Villanueva's use of the chemical bug spray and how he got access to it. *Id.* Minicola concluded the meeting by notifying Tanaka that he was unsure of what would happen and that the Hotel would make a decision on the discipline and notify the Union. *Id.*

After the July 20, 2010 meeting, Minicola received a written incident report and statement prepared by Hangai, and a statement from Yang that the spray can was not found in the housekeeping bag. Joint Ex. A at 1007-08, 1300. Minicola also received a written statement from Mad, asserting that she provided Villanueva deodorizer, not bug spray, on June 17, 2010. Specifically, Mad's statement provided:

> On 6/17/10                 Room 2151
> I (Rose) called Rhandy to spray room w/ deodorzer [sic].
> He ask where can I (Rhandy) get the spray[.]  I (Rose)
> said maids closet.  I (Rose) never give him 565 Plus to
> spray room.

Joint Ex. C at Resp't Ex. 26.  After collecting this additional information, Minicola made the final decision to terminate Villanueva and notified Villanueva and Lindo of this decision at a July 28, 2010 meeting.  Joint Ex. A at 1299-1302; Joint Ex. B at GC-4, p. 1.

Villanueva's termination document states that he was terminated based on his violation of the following House Rules:

> #1 - Falsification or giving misleading information on
> employment application or falsification of Company
> records or reports. . . .
>
> #2 - Theft or misappropriation of property (such as food,
> beverage or keys) . . . .
>
> #12 - Loitering or straying into areas not designed as

work areas, or where your duties do not take you.

#30 - Not reporting damaged or lost items belonging to the Company, guests, or outside agencies properties; refusing to cooperate with the Company in obtaining true and factual statements; dishonesty in any form.

#42 - Not complying with your respective Departmental Rules and Procedures.

Joint Ex. B at GC 4, p. 1.

Although Minicola did not provide any explanation at the July 28, 2010 termination meeting as to how Villanueva violated these rules, Minicola testified before ALJ McCarrick that he believed Villanueva had violated House Rule #1 for falsifying statements by saying that (1) he had previously gotten the bug spray from Mad; (2) he needed "disinfectant" rather than bug spray; (3) Villanueva uses the bug spray all the time; (4) he left the bug spray in the black housekeeping bag; and (5) he did not need to leave a note about what he took from the housekeeping office. Joint Ex. A at 70-72. Minicola further explained that Villanueva violated House Rule #2 when he failed to return the bug spray, and violated House Rule #12 when Villanueva accessed the housekeeping office after hours. *Id.* at 72-73. Minicola claimed that Villanueva violated House Rule #30 when he was dishonest about his statements to Hangai and other statements he made during the investigation, characterizing Villanueva's statements as "vague,

evasive, and unresponsive." *Id.* at 73. Lastly, Minicola testified that Villanueva

violated House Rule #42 when he failed to get proper authorization to access the

housekeeping office, removed the bug spray from the office without logging it, and

sprayed an occupied guest room. *Id.* at 73-74; 1325-26.

Minicola admitted that he was previously unaware of any procedures

for accessing the housekeeping office, and was also unaware if anyone had

informed Villanueva regarding the access procedure. *Id.* at 977, 1353-54. Further,

although Hangai testified that he believed Ko claimed that some individuals were

trained to use the 565 Plus (the specific bug spray Villanueva used), *see id.* at 677,

Respondents did not present Ko to testify before ALJ McCarrick, none of

Respondents' witnesses has identified *any* specific individual trained to use the bug

spray, and there is no evidence that anyone ever informed Villanueva that use of

the bug spray required training. *Id.* at 677-78, 979-80, 1357-58. Finally, Minicola

never reviewed Villanueva's production logs to determine whether they

substantiated Villanueva's assertions that he had used bug spray on other

occasions. *Id.* at 1364-65.

       *b.*    *Application*

The NLRA makes it an unfair labor practice for an employer "to

interfere with, restrain, or coerce employees in the exercise of the rights guaranteed

in section 157 of this title," 29 U.S.C. § 158(a)(1), or "by discrimination in regard

to hire or tenure of employment or any term or condition of employment to

encourage or discourage membership in any labor organization

. . . ." *Id.* § 158(a)(3). As the court previously explained in its March 29, 2010

Injunction, *Norelli*, 699 F. Supp. 2d at 1197-98, to determine the employer's

motivation in discharging an employee, "the General Counsel must make a prima

facie showing sufficient to support the inference that protected conduct was a

'motivating factor' in the employer's action." *In re Caruso Elec. Corp*., 332

NLRB 519, 522 (2000) (discussing *Wright Line*, 251 NLRB 1083 (1980)). "The

elements commonly required to support such a showing [that protected conduct

was a motivating factor] are union or protected activity by the employee, employer

knowledge of that activity, and union animus on the part of the employer."

*Intermet Stevensville*, 350 NLRB 1270, 1274 (2007). If this initial showing is

made, "the burden then shifts to the employer to prove, as an affirmative defense,

that it would have taken the same action even in the absence of the employee's

union activity." *Id.* (citing *Manno Elec.*, 321 NLRB 278, 280 n.12 (1996)).

   Petitioner has made a prima facie showing that the Board will likely

find, and the Ninth Circuit will affirm, that Villanueva's Union participation was a

motivating factor in his termination. First, Villanueva was an active Union

participant, promoting the Union even after he was terminated the first time in November 2007, and continuing his activities after he was reinstated in April 2010. Joint Ex. A at 111-12; *see also Norelli*, 699 F. Supp. 2d at 1198 (describing Villanueva's participation on the negotiating committee and other Union activities); *HTH Corp.*, 2009 WL 3147894, at *27-28 (NLRB Sept. 30, 2009) (acknowledging that Villanueva served continuously on the Union's negotiating committee from 2005 to 2007). Second, as outlined and specifically found in previous orders, Respondents were aware of Villanueva's Union activity and harbored great animus toward the Union, even terminating Villanueva once for his Union activity. *See HTH*, 2009 WL 3147894 (finding that Respondents failed to rebut Petitioner's "prima facie case, fraught with animus"), *affirmed by HTH Corp.*, 2011 WL 2414720, at *2; *see also supra* (discussing the various Board decisions finding violations of the NLRA by Respondents).

Thus, Respondents have the burden to prove that they would have terminated Villanueva even in the absence of his Union activity. Respondents have not carried this burden. Rather, the evidence presented suggests that Respondents terminated Villanueva based on rules (to the extent they actually existed) that were neither well-established nor known by Villanueva.

Indeed, as early as Villanueva's May 20, 2010 discipline for failing to

properly stock toilet paper and fill out his production logs, it appears that Respondents were looking for reasons to discipline Villanueva and contoured the Hotel rules to suit their needs. Specifically, as to Villanueva's stocking of the toilet paper on the top shelf of the housekeeping closet, Respondents provided Villanueva only one day of training when he began as Housekeeper II on April 12, 2010, Villanueva had last stocked the closets in 2003, and Villanueva was never told before the April 28, 2010 meeting that he should not place the toilet paper on the top shelf. Simply put, the evidence supports a finding that Villanueva was not told -- and did not know -- that he should not place the toilet paper on the top shelf, making his May 20, 2010 discipline unwarranted.[10]

In opposition, Respondents assert that this discipline was appropriate in light of the safety concern created by placing the toilet paper on the top shelf -- Hotel employees testified that toilet paper should always be stored on the bottom for safety concerns, and Villanueva even admitted that in retrospect, placing the toilet paper on the top shelf was not safe. Joint Ex. A at 335. This testimony does not change, however, that there were no written policies stating how to properly stock a housekeeping supply closet, and toilet paper had previously been placed on

---

[10] Respondents claim that "[w]hen the Housemen are first hired, they are given instructions on how to stock the housekeeping closets." Resp't Opp'n at 6-7. Although this statement might be true generally, the specific evidence in this case demonstrates that Villanueva received no such training, and in any event he was first hired in 1993.

the top shelf.  Further, it is not a matter of common sense (as Respondents argue) that the toilet paper should be placed on the bottom shelf -- the box weighed only 37 pounds and was 23 inches wide, 17 inches, and 18 inches deep, and any housekeepers that felt unsafe retrieving the toilet paper could have called a Houseman for assistance.  *See* Joint Ex. A at 885-86.  In sum, although it was perfectly appropriate for Respondents to give Villanueva directions on how to stock the shelves, the facts presented provided Respondents absolutely no reason that would support a written disciplinary measure where Villanueva was not previously told the rules.  Accordingly, this incident evinces Respondents' animus towards Villanueva.

As to Villanueva's failure to record on his log the times he started and finished each guest room that he cleaned, Respondents do not even offer an explanation for why this incident warranted a verbal written warning.  Rather, the evidence presented establishes that Villanueva was not previously told to indicate the times on his log, and that others had similarly failed to denote the times on their cards and received no discipline whatsoever.  *See* Joint Ex. B at GC21(A), A1-2, A30-31; GC21(B), B4-47; GC21(C), C5; GC21(D), D1-6.  Accordingly, this alleged violation of Hotel rules, like the toilet paper incident, appears to be due to Respondents' animus towards the Union such that Respondents would not have

given Villanueva the written verbal warning but for his Union activity.

As to Villanueva's access to the housekeeping office and use of the bug spray, there was no question as to why Villanueva sought access to the housekeeper's office (to retrieve the bug spray), and no question as to what Villanueva took (Hangai visually confirmed that Villanueva had taken the spray can and marked this activity on his security log). Villanueva's action of entering the housekeeping office can hardly be viewed as a violation of Hotel rules given that (1) Hangai, who purported to know the Hotel policy against access, allowed Villanueva access; (2) Respondents presented no evidence of any written policy regarding access to the housekeeping office; and (3) there is no evidence suggesting that Villanueva, who had previously worked the day shift when the office was open, knew of any Hotel policy that Housemen were not allowed access to the housekeeping office after it closes. Further, there is ample evidence that despite any assertion by Respondents of a policy against spraying chemicals in occupied guest rooms, *see* Joint Ex. A at 66, Housemen were not aware such policy existed. *See, e.g.*, *id.* at 152-57, 159-60, 1062. Indeed, Villanueva had previously used bug spray in guest rooms on a number of occasions and indicated such use on

his log, and was not corrected and/or disciplined.[11]  Joint Ex. B at GC14 pp. 12, 25, 32, 42.

Given that Villanueva's infractions of Hotel policies (to the extent those policies actually existed) were minor and at best caused by Respondents' failure to properly establish policies and/or train its employees, the evidence supports a finding that Villanueva's suspension and the following investigation and termination were based on Union animus, and that these actions would not have been taken by Respondents but for that animus.  That is, but for Villanueva's Union activity, Respondents would not have terminated him.

Indeed, Minicola's "investigation" and July 20, 2010 meeting bordered on farcical.  Minicola did not seek to determine whether the "rules" proffered by his managers were written (they were not), whether staff was informed of them (even Minicola admitted he was not aware of them), and whether Villanueva was told of them (he was not).  Instead, Minicola asked Villanueva a series of ambiguous questions without giving Villanueva any advance notice of the precise alleged rules violations at issue.  Minicola also gathered only the evidence that he knew would support a finding of rules violations by Villanueva -- Minicola

---

[11]  Respondents apparently ignore all of these facts in asserting that "[b]ased on the record, it is very clear that Villanueva did not actually spray the 565 Plus in any of the guest rooms on the night of July 5, 2010."  *See* Resp't Opp'n 67.  Respondents' assertion is not supported by the record.

relied on testimony and statements of his managers and did not review any objective evidence such as Villanueva's production logs.  Had Minicola reviewed Villanueva's production logs, he would have seen that Villanueva had documented his use of bug spray on several occasions, calling into serious question whether any of these "rules" that Villanueva allegedly violated actually existed.

Further, none of Minicola's explanations of the rules that Villanueva violated stands up to scrutiny.  Specifically, Minicola found that Villanueva had violated House Rule #1 by falsifying statements when he said that he (1) had previously gotten the bug spray from Mad; (2) needed "disinfectant" rather than bug spray; (3) uses the bug spray all the time; (4) left the bug spray in the black housekeeping bag; and (5) did not need to leave a note about what he took from the housekeeping office.  These conclusions are simply not supported by the record.  If Minicola had only reviewed Villanueva's production logs, he would have seen that Villanueva sprayed for insects on several previous occasions, referred to bug spray as "disinfectant" on his logs, and had logged that he sprayed on July 5.  Further, Villanueva's failure to leave a note stating what he took from the housekeeping office did not violate any Hotel rule that Respondents can point to, and leaving a note would appear redundant given that Hangai personally escorted Villanueva to confirm what was taken and Villanueva recorded spraying for bugs on his July 5,

2010 production log.  *Id.* at p. 45.

Minicola's (and now Respondents in their Opposition) assertions that Villanueva falsified statements only serves to highlight that Respondents were guided by the outcome they sought (terminating Villanueva) as opposed to the process (determining what really happened).  For example, as to Villanueva's statement that he had previously obtained bug spray from Mad, Mad provided Minicola a statement that on June 17, 2010, she provided Villanueva deodorizer, not bug spray, to use in a room.  Villanueva's production logs confirm this statement -- his production log on June 17, 2010 states "spray deodorizer" in room 2151.  *See* Joint Ex. B, GC Ex. 14, at 37.  As a result, it appears that Mad was asked to provide a statement regarding a date separate from when Villanueva asserts she provided him with the bug spray.  Further, Mad's statement that she "never give him 565 Plus to spray room," Joint Ex. C at Resp't Ex. 26, is ambiguous -- it is unclear whether Mad's statement means she never gave Villanueva the bug spray on June 17, 2010 (as opposed to any of the other occasions he used the spray), or that she never gave him bug spray on *any* date.  Given that Villanueva had sprayed for insects on multiple occasions, *see* Joint Ex. B at GC14 pp. 12, 25, 32, 42, and 45, Mad's statement hardly establishes that Villanueva was dishonest.  At the very least, a simple review of Villanueva's

production logs should have led Minicola to further investigation. Instead, Minicola jumped to the conclusion that Villanueva had lied.

As another example, Minicola's conclusion that Villanueva lied about needing "disinfectant" to gain access to the housekeeping office is spurious. The record makes clear that Villanueva consistently used the term "disinfectant" to refer to aerosol sprays. Respondents nonetheless insist that Villanueva knew the difference between bug spray and disinfectant because he also used the term "disinfectant" to refer to deodorizers. *See* Resp't Opp'n at 21. But Villanueva's testimony establishes that he used this term indiscriminately to refer to aerosol sprays, which is not surprising given that English is his second language. And a simple review (again, which Minicola did not do) confirms that Villanueva believed that the term "disinfectant" in fact included bug spray -- his July 3, 2010 production log (created prior to the time Villanueva would have any motive to lie) states "spray disinfectant (Roaches)." Joint Ex. B, GC 42. Thus, any argument that Villanueva intentionally deceived Hangai is absurd.

As to Minicola's assertion that Villanueva violated House Rule #2 prohibiting theft when he failed to return the bug spray, Minicola had no evidence that Villanueva stole the spray can. Given that Villanueva felt that Hotel management was watching him, Joint Ex. A at 409-10, Villanueva was especially

careful in placing the spray can in his housekeeping bag at the end of the night and it would make no sense that Villanueva would steal a spray can that Hangai specifically watched him take for use in the Hotel.  Thus, Minicola's speculative conclusion that Villanueva stole the bug spray provides further support that Respondents were motivated by Union animus and would not otherwise have taken the same disciplinary actions.[12]

As to Minicola's finding that Villanueva violated House Rule #12 prohibiting entry into non-designated areas when he accessed the housekeeping office after hours, even Minicola admitted that he was not aware of any specific rules regarding entry into the housekeeping office.  Given the particular circumstances -- that Hangai escorted Villanueva to the housekeeping office and allowed Villanueva to enter, and Villanueva was new to working the evening shift -- this "violation" lacks support and reflects not a neutral application of the House Rules, but a specific animus towards Villanueva because of his Union support.[13]

---

[12]  Indeed, Respondents took lesser disciplinary actions against other employees that misplaced items.  For example, Housekeeper J.B. "lost" the master key card and failed to report it missing, which led to the Hotel having to re-key the master key card and re-program all guest rooms in the Beach Tower.  Joint Ex. B at GC24(D), pp. 1-11.  J.B. also lied to housekeeping supervisor Hind about whether he had gone to an unassigned floor, but was not cited for "dishonesty."  *Id.* at p. 1.  Compared to Villanueva's suspension and termination, the Hotel gave J.B. a verbal warning and a five-day suspension.  *Id.* at pp. 1, 6.

[13]  Respondents assert "[t]he fact that the door to the Housekeeping Office is locked, and housekeeping employees are not given a key to the office, clearly means that housekeeping

(continued...)

As to Minicola's claim that Villanueva violated House Rule #30 by being dishonest at the July 20, 2010 meeting, the minutes of the July 20, 2010 meeting reveal that Minicola asked Villanueva a series of vague questions that Villanueva did not fully understand, *see* Joint Ex. B at GC20, and Omonaka described Minicola's questioning as confusing. Joint Ex. A at 780. This single interview with Villanueva hardly supports a finding that Villanueva tried to impede Minicola's investigation and/or otherwise was dishonest given that Minicola refused to tell Villanueva and the Union officials up front the precise subject matter of the meeting, English is not Villanueva's first language, and Minicola did not make much effort at all to clarify his questions. Further, although Minicola did receive some evidence suggesting that Villanueva may have violated some rules on use of the bug spray, there is no dispute that Villanueva had sprayed for insects on multiple occasions and did not know of these rules such that his actions did not warrant the harsh discipline of termination meted out by the Hotel.

Finally, as to Minicola's assertion that Villanueva violated House Rule #42 requiring employees to follow Hotel rules when he failed to get proper authorization to access the housekeeping office, removed the bug spray from the

---

[13](...continued)
employees do not have permission to enter the office at night." Resp't Opp'n at 71. Again, Respondents overreach. Indeed, the evidence presented establishes that regardless of any purported "policy" against access, the security guards provided access when asked.

office without logging it, and sprayed an occupied guest room, as explained above, there were no established Hotel rules on these issues. Indeed, even Minicola admitted that he was unaware of any written policies or procedures regarding access to the locked housekeeping office.

In opposition, Respondents argue that there were multiple instances in which Villanuava was dishonest, supporting his termination. For example, Respondents assert that Villanueva (1) lied to Hangai when he sought the "disinfectant" from the housekeeping office; (2) could not identify who had given him the work order to spray the cockroach; and (3) lied about spraying because no guests were moved from their rooms and Villanueva's description of the guests did not match the guests that stayed in the room he allegedly sprayed. As explained above, the court rejects that the record suggests that Villanueva was dishonest and Respondents' assertions to the contrary are offensive in light of the record. Throughout his logs and testimony, Villanueva has consistently used the term "disinfectant" to refer to aerosol sprays (whether bug or deodorizer) such that his use of this word with Hangai does not support any inference of deceit. Most importantly, prior to July 5, he referred to spraying "disinfectant" to kill roaches. *See* Joint Ex. B, GC 14 at 42. Further, that Villanueva could not identify who gave him the work order and/or possibly described the room's occupants incorrectly

should come as no surprise[14] -- Villanueva had used bug spray on several other

occasions, and he was questioned about the July 5, 2010 event over two weeks

after it occurred.  Finally, there is no evidence that Villanueva actually lied about

spraying for a cockroach -- he obtained the bug spray and wrote on his log "spray

dis/bugs."

Further, although not necessary to the court's determination that

Respondents have failed to establish that they would have disciplined and

terminated Villanueva regardless of his Union activity, the court recognizes that

ALJ McCarrick made specific credibility determinations that Minicola was "an

evasive, often unresponsive witness whose statements in many cases were absurd

and self-serving," that Villanueva honestly answered Minicola's questions at the

July 20 meeting, and that Hangai and Mad were incredible witnesses.  *HTH Corp.*,

2011 WL 4073681, Doc. No. 36-1 at 24.  Specifically, ALJ McCarrick explained:

> The transcript [of the July 20, 2010 meeting] revealed
> that Villanueva was cooperative, responsive to
> Minicola's question and in no way appeared to
> prevaricate.  It is credible that Villanueva was unsure of a
> specific date in July that he sprayed a room for insects

---

[14]  These alleged acts of "dishonesty" were not a basis of Minicola's stated reasons for
terminating Villanueva, and the court discusses them here only to rebut Respondents' assertions
that Villanueva was deceitful and/or dishonest, whether during Minicola's investigation or
before ALJ McCarrick.  Further, as to Respondents' assertion that Villanueva lied about the
occupants of the hotel room, ALJ McCarrick specifically found Respondents' testimony
incompetent on this point.  Joint Ex. A at 939.

given the fact that Minicola refused to tell the Union or Villanueva the precise nature of Villanueva's alleged infractions until the July 20 meeting. Moreover, much was made of Villanueva's use of the term "disinfectant" for the 565 Plus bug spray. It should be noted here that English is not Villanueva's primary language. At the hearing it was obvious that Villanueva's use of English was rudimentary at best. There is no dispute that Villanueva showed Hangai the can of 565 Plus when he referred to it as "disinfectant" on July 5. There could have been no doubt in Hangai's mind that Villanueva's use of the term "disinfectant" was the 565 Plus. Even Hangai's cursory look at the can in the housekeeping office on July 5 would have revealed it to be bug spray not "disinfectant." It stretches credibility to suggest that Villanueva was lying or less than candid with Minicola at the July 20 meeting.

. . .

While [Roselind] Mad denied ever giving Villanueva 565 Plus, I found Mad to be an incredible witness. Her demeanor suggested she was not telling the truth when asked if she had given Villanueva 565 Plus. She refused to look at me, hesitated and answered in a voice lower than that given in her other testimony. I credit Villanueva that he had received the 565 Plus from Mad on more that (sic) one occasion. Villanueva's own contemporary production logs reflects that his use of "disinfectant" was used in conjunction with bugs on numerous occasions and independently corroborate his testimony that he obtained bug spray from someone in the housekeeping office, the only location where 565 Plus was stored.

*Id.* at 10.

Upon review, these credibility determinations will be upheld by the

Board and the Ninth Circuit "unless they are 'inherently incredible or patently

unreasonable.'"[15] *New Breed Leasing Corp. v. NLRB*, 111 F.3d 1460, 1465 (9th

Cir. 1997) (quoting *Retlaw Broad. Co. v. NLRB*, 53 F.3d 1002, 1006 (9th Cir.

1995)); *see also HTH Corp.*, 2011 WL 2414720, at *15 n.2 ("The Board's

established policy is not to overrule an administrative law judge's credibility

resolutions unless the clear preponderance of all the relevant evidence convinces us

that they are incorrect."); *NLRB v. McClain of Ga., Inc.*, 138 F.3d 1418, 1422-23

(11th Cir. 1998) (refusing to disturb the ALJ's credibility findings absent any

showing that credibility determinations were self-contradictory or unreasonable).

Given that ALJ McCarrick provided "substantial bases for each credibility

determination, including determinations regarding the witness' demeanor, the

coherence of his testimony, and corroboration of his testimony by other witnesses,"

the Board and then the Ninth Circuit will likely affirm these credibility

determinations. *New Breed Leasing Corp.*, 111 F.3d at 1465. Thus, the Board and

---

[15] Respondents question ALJ McCarrick's credibility findings, specifically pointing to a finding where ALJ McCarrick stated that "[housekeeping manager] Lam incredibly testified that insects reported in guest rooms where the guests are present must be caught by hand, and not sprayed. It strains credulity that a line of ants could be caught by hand." Doc. No. 37, Resp't Opp'n at 29; *see also HTH Corp.*, 2011 WL 2414720, at *14 (NLRB June 14, 2011). Respondents may be correct that Lam testified that roaches, not ants, were caught by hand; regardless, this nitpicking falls well short of proving ALJ McCarrick's findings are "inherently incredible or patently unreasonable." *New Breed Leasing Corp. v. NLRB*, 111 F.3d 1460, 1465 (9th Cir. 1997). Further, the notion that the Hotel's policy on cockroaches is to require the Housemen to catch them by hand appears equally questionable.

the Ninth Circuit will likely reject Respondents' assertions that Villanueva was anything but honest, whether during Minicola's July 20, 2010 interview or while testifying before ALJ McCarrick.

Respondents further argue that Villanueva was treated the same as other employees, and that some employees were terminated for infractions that were even less severe than those committed by Villanueva. Resp't Opp'n at 69. Again, the court disagrees. As explained above, Villanueva was ultimately terminated for violating a handful of unwritten rules of which he was not aware and where not otherwise intuitive. Under these circumstances, Villanueva's termination does not appear similar in kind to terminations of other employees. Further, Respondents terminated Hotel employees for violations that were far more serious than Villanueva's alleged violations, including, among others, the termination of (1) B.F.[16] for failing to report to work for three days; (2) S.J. for failing to report for work for six days; (3) B.T. for sleeping during his shift; (4) K.C. for completing his time card for a day he did not work; and (5) J.B. for a repeated refusal to follow directions of his supervisor and failure to perform his job duties. Joint Ex. B at GC25(G), p. G8; Joint Ex. C at Resp't 12, pp. 3, 12, 27, and

---

[16] Out of privacy concerns for disciplined employees, the court refers to them by their initials.

71.

In sum, under these circumstances presented in the record -- where there is no evidence of any established rules that Villanueva violated, no evidence that Villanueva was aware of the rules he allegedly violated, and scant evidence supporting Minicola's conclusion for termination -- the court has little difficulty in finding that the Board will find, and the Ninth Circuit will affirm that Villanueva would not have been terminated but for his Union activity.

## 2. *Unilateral Changes*

Petitioner argues that Respondents made unilateral changes in the terms and conditions of employment in violation of §§ 8(a)(1) and 8(a)(5) of the Act when they (1) increased the number of rooms housekeepers must clean; and (2) banned two Union officials from Hotel property. The court addresses these allegations in turn.

### a. *Change in housekeeper room cleaning requirements*

#### i. Facts

In December 2007, Respondents unilaterally changed the number of rooms that housekeepers must clean from 15 to 17 rooms per day in the Beach Tower and 16 to 18 rooms per day in the Ocean Tower. *See HTH Corp.*, 2011 WL 2414720, at *2, 6. The March 29, 2010 Injunction required Respondents to rescind

this (and multiple other) unilateral changes upon the Union's request. *Norelli*, 699

F. Supp. 2d at 1207. Accordingly, upon the Union's request, on April 18, 2010,

Respondents restored the original room cleaning assignments. Joint Ex. A at 1509;

Joint Ex. B at GC36.

At a June 24, 2010 meeting between Minicola and Union

representatives, Minicola gave notice that effective July 1, 2010, Respondents were

again increasing the room cleaning requirements from 15 to 17 rooms per day in

the Beach Tower and from 16 to 18 rooms per day in the Ocean Tower.[17] Joint Ex.

A at 1501, 1503; Joint Ex. B at GC54. Minicola explained that the increase was

due to, among other things, economic hardship and the changing nature of the hotel

occupancy. Joint Ex. A at 1501, 2658-59, 2660-61. In a June 25, 2010 letter

confirming this meeting, Minicola told Union representative, Dave Mori ("Mori"),

that the Hotel would be increasing the room assignment requirements as discussed,

and that the Hotel is willing "to bargain over the effects of the changes." Joint Ex.

B at GC54. Also in a June 25, 2010 letter, Mori demanded that Minicola not

implement any unilateral changes until, among other things, the Hotel bargains

with the Union. Joint Ex. B at GC55. As promised by Minicola, the increase to

---

[17] Prior to this June 24, 2010 meeting, Minicola and Union representatives had met on a few occasions to discuss implementation of the March 29, 2010 Injunction. According to Minicola, during these meetings he raised the Hotel's need to increase the room assignments due to financial reasons. Joint Ex. A at 2651-57.

the room cleaning requirements went into effect on July 1, 2010. Joint Ex. A at 2664.

In a September 13, 2010 letter, Minicola stated that Respondents were implementing the original 15 room requirement for the Beach Tower and the 16 room requirement for the Ocean Tower. Joint Ex. B at GC76. Minicola explained that the increase did not work -- "[w]hile the housekeepers were scheduled with the 17-18 rooms in mind, the Hotel found it unworkable and the so-called quota 15-16 rooms never really changed despite that notice and the attempts to schedule with 17-18 rooms." *Id.* Minicola therefore reasoned that "the 15-16 rooms quota is back in place and in fact has never changed." *Id.*

Despite Minicola's September 13, 2010 letter asserting that the room assignment requirements were restored, the housekeeping logs reflect that Respondents did not restore the room requirements as promised in Minicola's September 13, 2010 letter. Specifically, housekeeper Virginia Recaido's ("Recaido") logs reveal that since September 13, 2010, she had cleaned rooms according to the higher requirements. Joint Ex. A 2180-2209, 2235-46, 2247-54, 2251-61, 2262-76, 2282-86; Joint Ex. B at GC93; Joint Ex. C at Resp't Exs. 29-32. Further, even Minicola now asserts that "[f]or a few months during the end of 2010 and beginning of 2011, the number of rooms assigned to housekeepers to clean

fluctuated due to economic demands of the Hotel's operations," resulting in times where housekeepers were assigned either more or less than the agreed-to number depending on the Hotel's needs. *See* Doc. No. 37-1, Minicola Decl. ¶ 3. Minicola further asserts that "[a]s of April 2011, the housekeeping room assignments remained at 15 per day for the Beach Tower and 16 per day for the Ocean Tower." *Id.* ¶ 4.

ii.    Application

"[A]n employer violates sections 8(a)(1) and 8(a)(5) of the Act if it makes a unilateral change in a term or condition of employment -- so-called 'mandatory subjects' of bargaining -- without first bargaining to impasse over the relevant term." *Local Joint Exec. Bd. of Las Vegas v. NLRB*, 540 F.3d 1072, 1075 (9th Cir. 2008) (discussing *NLRB v. Katz*, 369 U.S. 736 (1962)); *Richmond Elec. Servs.*, 348 NLRB 1001, 1002 (2006). "A bargaining impasse occurs at the point in time when the parties would be warranted in believing that continued bargaining would be futile." *Richmond Elec. Servs.*, 348 NLRB at 1002. And where the parties are negotiating a collective bargaining agreement, "an employer's obligation to refrain from unilateral changes extends beyond the mere duty to give notice and an opportunity to bargain; it encompasses a duty to refrain from implementation at all, unless and until an overall impasse has been reached on

bargaining for the agreement as a whole." *Bottom Line Enters.*, 302 NLRB 373, 374 (1991). The Board recognizes two limited exceptions to requiring an employer to bargain to impasse: "[w]hen a union, in response to an employer's diligent and earnest efforts to engage in bargaining, insists on continually avoiding or delaying bargaining, and when economic exigencies compel prompt action." *Id.*

The mandatory subjects of bargaining include "wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d). Employees' workloads, such as the number of rooms a housekeeper must clean at issue here, is a mandatory subject of bargaining. *See HTH*, 2011 WL 2414720, at *6 (holding that Respondents violated §§ 8(a)(1) and (5) of the Act unilaterally changing the housekeepers' workloads by adding two additional rooms to clean per day); *see also Beacon Piece Dyeing & Finishing Co.*, 121 NLRB 953 (1958) (explaining that workloads such as the number of machines assigned to an employee are mandatory subjects of bargaining).

The evidence clearly establishes that Respondents unilaterally changed the number of rooms that housekeepers were assigned to clean without bargaining to impasse on a collective bargaining agreement. Thus, unless Respondents' conduct falls within a recognized exception, the Board will have little trouble finding, and the Ninth Circuit should very easily affirm, that

Respondents violated the Act by making this unilateral change.

None of Respondents' justifications for making this unilateral change withstands scrutiny. For example, Respondents argue that the change was de minimis -- and therefore not subject to mandatory bargaining -- because the changes lasted for only several months and the actual number of rooms housekeepers cleaned fluctuated such that the change did not affect the housekeeper's overall workload. Resp't Opp'n at 73-74. As an initial matter, Respondents' assertion that the increase in rooms did not affect housekeeper workloads is not supported by the evidence -- although Minicola generally asserts that the number of rooms housekeepers were required to clean fluctuated, the more specific and objective evidence (*i.e.*, Reciado's testimony and logs), establishes that she was consistently assigned to clean rooms based on the higher room requirement.

Further, the room assignment requirement was not de minimis -- it materially and significantly affected the terms and conditions of employment of the housekeepers by increasing the number of rooms they may need to clean on a given day. *See HTH*, 2011 WL 2414720, at *6 (holding that the number of rooms that housekeepers must clean is a mandatory subject of bargaining); *see also EAD Motors E. Air Devices, Inc.*, 346 NLRB 1060, 1065 (2006) ("[T]he Board has

made clear that in order to constitute a unilateral change that violates the Act, an employer's action must effect a material, substantial, and significant change in terms or conditions of employment."); *Seattle First Nat'l Bank v. NLRB*, 444 F.2d 30, 33 (9th Cir. 1971) ("A mere remote, indirect or incidental impact is not sufficient."). That the increase was not de minimis is confirmed by the fact that Respondents disciplined housekeepers who failed to clean their assigned number of rooms. *See* Joint Ex. C at Resp't Ex. 14, p. 53 (disciplining housekeeper Marissa Julian on July 26, 2010 for failure to complete cleaning 17 rooms in the Beach Tower); *see also* Joint Ex. B at GC24(A), pp. 10, 14, 21, 28; GC24(I), pp. 15, 31, 52 (disciplining housekeepers for failure to meet quotas between 2007 and 2009).

Respondents also argue that this unilateral change is justified because the Union engaged in delay tactics by refusing to bargain over this issue and instead insisted upon reaching a collective bargaining agreement. Respondents even go so far as to suggest that Minicola and the Union had bargained over this change during their preliminary meetings regarding implementation of the March 29, 2010 Injunction and the Union simply refused to discuss the matter. *See* Resp't Opp'n at 75; *see also* Joint Ex. A at 1731. Contrary to Respondents' attempt to cast these preliminary meetings, they were not formal negotiations -- Respondents did not engage in *any* formal negotiations with the Union until August 30, 2010

(after they had already implemented the change in room requirements). *See* Joint

Ex. A at 1758; *see also* Joint Ex. B, GC Exs. 54-57, 60-61 (letters between Mori

and Minicola describing meetings prior to August 30, 2010). Indeed, there is no

evidence that Respondents ever sought to engage in formal negotiations over the

room assignment requirements before implementing this unilateral change. *See*

Joint Ex. B at GC96 (Negotiations Ground Rules Agreement, signed by Minicola

and Mori, outlining that formal negotiation sessions be set by mutual agreement of

the parties, rotate locations between the Union's and the Hotel's choice, and that

the parties must communicate at the negotiation table through their spokespeople,

Mori and Minicola); *see also* Joint Ex. A, at 2684-85. Thus, without any attempt

on Respondents' part to formally bargain over this change, the Union (who took a

perfectly valid position of seeking an agreement instead of a piecemeal approach)

could not have engaged in any delay tactics.[18]

    Respondents further argue that the change in the housekeeping room

---

[18]  The court also finds relevant the timing of this unilateral change as supporting a lack
of delay by the Union. The March 29, 2010 Injunction required the parties to begin negotiations
from the point that negotiations stopped between the Union and PBH Management, LLC
("PBHM"), an entity that managed the Hotel from January 2007 until November 30, 2007. On
June 14, 2010, the Union provided Respondents a list of all tentative agreements the Union
believed it had entered into with PBHM, and Respondents were still reviewing the list as of the
first negotiation session on August 30, 2010. Joint Ex. B at GC52; Joint Ex. A at 1734-35.
Given that one of the tentative agreements was the room assignment requirements and Minicola
implemented this change before even reviewing all of the tentative agreements, there is simply
no evidence that the Union delayed in negotiations.

assignment requirements was due to economic exigencies. Again, this argument

lacks evidentiary support. The exception to bargaining to impasse due to economic

exigencies is limited to "extraordinary events which are an unforeseen occurrence,

having a major economic effect [requiring] the company to take immediate action."

*RBE Elec. of S.D., Inc.*, 320 NLRB 80, 81 (1995) (quoting *Hankins Lumber Co.*,

316 NLRB 837, 838 (1995)). For example, "the Board has held that economic

events such as loss of significant accounts or contracts, operation at a competitive

disadvantage, or supply shortages do not justify unilateral action." *Id.* (footnotes

omitted). Respondents fail to identify, much less establish through evidence, any

extraordinary event that has had a major economic effect requiring the Hotel to

change the housekeeping room assignment requirements.[19]

      Finally, Respondents assert that the room assignment numbers have

been restored since April 2011. Whether the room assignment numbers have been

restored, however, is not relevant to whether Respondents violated the Act in the

first instance.

      In sum, the court finds that Petitioner has a high likelihood of success

in establishing to the Board and then the Ninth Circuit that Respondents have

---

[19] As explained below, Respondents provided only the most basic financial information which is insufficient for the Union, the Union's accountant, and even this court to determine whether Respondents' assertions of poverty have any merit whatsoever.

violated the Act by unilaterally changing the housekeeping room assignment requirements without bargaining to impasse in violation of §§ 8(a)(1) and 8(a)(5) of the Act.

> b.     *Access to the Hotel*

> > i.     Facts

Since approximately 2006, the Hotel and the Union had an oral understanding regarding the procedure for Union representatives to gain access to the Hotel.  Joint Ex. A at 1418-19.  Minicola testified that under the terms of the oral understanding, the Union representative would request access and inform the Hotel of who would be coming, the date and time of access, and the reason for access.  *Id.* at 1419.  Minicola granted requests on the condition that the Union representatives would not enter unauthorized areas or disrupt Hotel operations.  *Id.*

On April 28, 2010, Mori requested permission to enter Hotel property to have lunch at Respondent's Oceanarium Restaurant (the "Oceanarium") with Union organizer Carmelita Labtingao ("Labtingao"), and Minicola granted Mori's request.  *Id.* at 1421-23, 1676.

Upon Mori and Labtingao's arrival at the Oceanarium, bus help Midori Fukushima ("Fukushima") greeted Labtingao, whom Fukushima recognized as having worked at the Hotel and with the Union.  *Id.* at 1552-53,

1555-56.  Labtingao asked Fukushima if she remembered her, and Fukushima answered, "Yes, you're from the Union."  *Id.* at 1820.  Labtingao testified that Fukushima mentioned that times were hard because Fukushima had less hours.  *Id.* at 1820-21.  Labtingao told Fukushima that the Hotel is recognizing the Union, and Fukushima then left the table.  *Id.* at 1558, 1821-22.

Oceanarium Assistant Manager Charles Sayles ("Sayles") testified that soon after Mori and Labtingao arrived, Fukushima came back to his office behind the bus station looking "kind of upset" and shaking her head.  *Id.* at 2504.  When Sayles asked Fukushima if she was okay, Fukushima said, "Oh, the lady outside asked me if . . . you're part of the Union" and that when Fukushima told Labtingao that she did not know, Labtingao said, "Yeah, you are part of the Union."  *Id.* at 2505; Joint Ex. B at GC 80, p. 3.  Sayles testified that Fukushima refused to go back onto the restaurant floor.  *Id.* at 2506.

In contrast, Fukushima testified that she was not upset by what Labtingao said to her, nor did she tell anyone in the Oceanarium that she was upset or that she refused to go back onto the restaurant floor.  *Id.* at 1559, 1567.  According to Fukushima, when she saw that Sayles was waiting to talk to her by the entrance to his office, she asked him if the Hotel joined the Union, and Sayles wanted to know what Mori and Labtingao said to Fukushima.  *Id.* at 1559-60.

50

Sayles then told Fukushima not to return to the restaurant floor, and Fukushima testified that she did not understand why the restaurant management was "making such a big deal out of this." *Id.* at 1561, 1598. Fukushima further testified that neither Labtingao nor Mori were loud in any way nor were they causing any commotion at the Oceanarium. *Id.* at 1567; *see also id.* at 1687 (Mori testifying that Fukushima did not look upset or give any indication that she was upset).

Beyond speaking with Fukushima, Labtingao testified that she also said hello in passing to wait help Joyce Kekona ("Kekona"), but nothing else.[20] *Id.* at 1824. Fukushima, however, met with Kekona in the back of the Oceanarium, and Kekona said Labtingao told her that the Hotel had joined the Union. *Id.* at 1611. Fukushima testified that Kekona seemed upset because she was speaking loudly, but that Kekona is generally a loud person who makes big gestures. *Id.* at 1603. Banquet porter Alexander Adams ("Adams") testified that Kekona appeared irritated that Mori and Labtingao spoke to her about the Union. *Id.* at 2378.

According to Sayles, because Fukushima was upset, he told Mori and Labtingao that they cannot talk to employees about the Union while on shift and that Fukushima had complained; Mori agreed to the request. *Id.* at 1464, 2510-11, *see also* Joint Ex. B at GC88, p. 4. Because Fukushima was still upset, Sayles

---

[20] Kekona did not testify in the administrative hearing.

called Safety and Security Manager Hangai to report that Fukushima felt harassed. *Id.* at 1470-71, 2511.  Hangai, accompanied by two security officers in case he needed backup, went to the Oceanarium and interviewed Fukushima.  *Id.* at 2400. Hangai testified that during his interview with Fukushima, she looked visibly upset and told him that "they had said things to her" and that she did not want to return to the floor.  *Id.* at 1623-24.  Hangai also spoke to Kekona, who told him that Mori and Labtingao told her "you're in the Union," and that Kekona responded "yeah, yeah, yeah, I didn't want to be involved" and walked away.  *Id.* at 1626.

After speaking with Fukushima, Hangai told Mori that they had received a complaint that he and Labtingao were being disruptive and that both of them would have to leave the area.  *Id.* at 1621-22, 1685.  Mori refused to leave, saying he had done nothing wrong, and Hangai told Mori that he would call the police.  *Id.* at 1622, 1685.  After Mori's conversation with Hangai, Mori and Labtingao paid for their meal and left the Oceanarium.  *Id.* at 1686.

On May 6, 2010, Minicola issued a letter to Mori, permanently banning him and Labtingao from Hotel premises.  *Id.* at 1437-38, Joint Ex. B at GC42, p. 2.  Minicola testified that he made his decision based on Hangai's written security report and conversations with Sayles, Hangai and Mori.  *Id.* at 1436. Mori, however, denies speaking with Minicola about the Oceanarium incident prior

to May 6, 2010 and spoke with Minicola only after receiving the May 6, 2010 letter to explain that he had not spoken with any employees during lunch and that he objected to Hangai's asking him to leave.  *Id.* at 1689, 1692, 2619-20.

Minicola subsequently posted a May 14, 2010 memorandum to Hotel employees, which in part stated that Mori and Labtingao were asked to leave Hotel property and not return because they disrupted Hotel operations and that the incident had been filed with the police department.  Joint Ex. B at GC45.[21] Although Minicola has allowed other Union representatives access to the Hotel, Mori and Labtingao have not returned to the Hotel since April 28, 2010.  Joint Ex. A at 1703, 2628-29.  Minicola stated that he would allow Mori access to Hotel property if he apologized to the employees, and Mori refused.  *Id.* at 2624.

### ii.    Application

"An employer's regular and longstanding practices that are neither random nor intermittent become terms and conditions of employment even if these practices are not required by a collective-bargaining agreement."  *Prime Healthcare Servs.-Garden Grove LLC*, 357 NLRB No. 63, 2011 WL 3804018, at *8 (Aug. 26, 2011) (citing *Sunoco, Inc.*, 349 NLRB 240, 244 (2007)).  As a result,

---

[21] On May 14, 2010, Hangai filed a police report regarding the incident, but there was no further police involvement.  Joint Ex. A at 1633; Joint Ex. B at GC81.

"these past practices cannot be changed without offering the unit employees'

collective-bargaining representative notice and an opportunity to bargain." *Id.*

(citing *Sunoco, Inc*., 349 NLRB at 244).  An employer's regular practice of

allowing union officials access to facilities may become a term and condition of

employment requiring notice and bargaining before a change.  *See Ernst Home*

*Ctrs., Inc.*, 308 NLRB No. 116, 1992 WL 238855, at *2-3 (NLRB Sept. 17, 1992);

*Granite City Steel Co.*, 167 NLRB 310, 315 (1967).

The parties do not dispute that Respondents had a practice of allowing

Union representatives access to Hotel facilities on the condition that Union

representatives would not enter unauthorized areas or disrupt Hotel operations, and

that any change in this policy would require mandatory bargaining.  Thus, the

relevant question presented is whether Respondents' ban of Mori and Labtingao

was a change in that policy requiring bargaining, or simply an implementation of

that policy based on a disruption of Hotel operations.

The evidence presented tells two different stories.  According to

Sayles and Hangai, Labtingao upset Fukushima to the point where Fukushima

refused to return to her duties bussing tables.  If this testimony is credited, Mori

and Labtingao arguably caused a disruption at the Oceanarium, which would

potentially allow Minicola to ban them from the premises.  In comparison,

according to Fukushima, Labtingao, and Mori, Fukushima was not upset and failed to return to the floor only upon Sayles' instructions.  If this testimony is credited, then Mori and Labtingao did not cause any disruption and Minicola's decision to ban them was a unilateral change of the policy of allowing Union representatives access to the Hotel.

Despite these two different stories, Petitioner has carried his burden of "producing some evidence to support the unfair labor practice charge, together with an arguable legal theory."  *Frankl*, 650 F.3d at 1356.  And between these two stories, Petitioner has presented evidence supporting that the version told by Fukushima and Mori is more likely than the one told by Sayles and Hangai. Specifically, prior to this incident Respondents had put Hotel staff on notice that Mori and Labtingao were having lunch at the Oceanarium and that they were not allowed to discuss the Union with employees.  *See* Joint Ex. B at GC88, p. 4 (security log stating that "Dave Mori will dining [sic] at the Oceanarium.  Received instructions that: he should not conduct any Union business with employees while on PBH property").  Further, Minicola (again) did only a cursory investigation into the incident and did not interview employees Kekona or Fukushima, who expressly refused to sign a statement regarding this event that was prepared by the Hotel. Joint Ex. A at 1568-69.  Finally, Minicola not only banned Labtingao and Mori,

but made an example of them by posting that they were banned and requiring Mori to apologize to the employees to be allowed back on the premises. These additional facts suggest that Minicola was looking for reasons to ban Union representatives from Hotel property and used Labtingao's discussion of the Union with Oceanarium employees as the excuse.

And making Petitioner's likelihood of success on the merits even stronger is that as between these two stories, ALJ McCarrick specifically credited Fukushima's testimony over that of Sayles and Hangai:

> I credit Fukushima's testimony that she told neither Sayles nor Hangai that she was upset by her conversation with Labtingao nor did she tell them she did not want to go back out into the restaurant. Rather, she remained in the service area because Sayles told her to do so. It is clear that Fukushima's first language is Japanese. However, according to Sayles, his discussion with Fukushima was in English. Hangai also spoke English to Fukushima. It is likely that it was Sayles not Fukushima who was upset when he learned that the Union representatives Mori and Labtingao were in his restaurant and spoke to an employee about the Union. From the overreaction of both of her boss, Sayles, and Security Chief Hangai, it is not surprising that Fukushima did not appear happy but rather stiff and tense. I find Fukushima's hearing testimony translated from English to Japanese is the more reliable account.

*HTH Corp.*, 2011 WL 4073681, Doc. No. 36-1, at 18. He concluded, in part, that "I have credited Fukushima that she was not upset by Labtingao's comments." *Id.*

at 19.  This credibility determination is not "inherently incredible or patently unreasonable" and therefore will likely be upheld by the Board and then the Ninth Circuit.  *See New Breed Leasing Corp.*, 111 F.3d at 1465.

Thus, given the evidence presented and in light of ALJ McCarrick's credibility determinations, the Board will likely find and the Ninth Circuit will affirm that banning Mori and Labtingao from the premises was a unilateral change subject to mandatory bargaining.[22]

### 3. *Failure to Produce Requested Information*

"It is long-established law that the duty to bargain in good faith embodied in Section 8(a)(5) of the Act includes the obligation of employers to provide their employees' collective-bargaining representatives with requested information which is relevant and necessary to the representative's duty to bargain on behalf of employees."  *H&R Indus. Servs.*, 351 NLRB 1222, 1223 (2007) (citing *NLRB v. Acme Indus. Co.*, 385 U.S. 432, 435-36 (1967)); *Doubarn Sheet Metal*, 243 NLRB 821, 823 (1979).  An employer fails to bargain in good faith in violation of § 8(a)(5) of the Act when it delays and/or fails to produce relevant information.  *Acme Indus. Co.*, 385 U.S. at 437; *NLRB v. Truitt Mfg. Co.*, 351 U.S.

---

[22]  The court therefore need not address the parties' arguments regarding whether the term "disruption" was defined and/or understood between the parties.

149 (1956).  "[T]he Board uses a broad, discovery-type of standard in determining relevance in information requests."  *Caldwell Mfg. Co.*, 346 NLRB 1159, 1160 (2006) (citations omitted).

But there are situations where an employer is justified in limiting or conditioning disclosure of otherwise relevant information where there are overriding interests.  *See Detroit Edison Co. v. NLRB*, 440 U.S. 301, 319-20 (1979).  Specifically, "[w]here the relevance of requested information has been established, an employer can meet its burden of showing an adequate reason for refusing to supply the information by demonstrating a 'legitimate and substantial' concern for employee confidentiality interests which might be compromised by disclosure."  *Ormet Aluminum Mill Prods.*, 335 NLRB 788, 801 (2001) (quoting *Detroit Edison Co.*, 440 U.S. at 318-320).

Petitioner asserts that Respondents have failed to furnish and/or delayed in furnishing to the Union information that is relevant and necessary to the Union's duties as the exclusive collective-bargaining representative of the Hotel's employees.  The court addresses each of Petitioner's claims in turn.

///

///

///

a.    *Failure to produce information related to collective bargaining*

i.    Facts

After the March 29, 2010 Injunction, the Union requested various information regarding Hotel employees' concerns about scheduling and benefits. Specifically, in a June 8, 2010 letter, Mori requested (1) a seniority list with departmental work schedules from December 1, 2007 to the present; (2) daily room assignments for housekeeping employees from April 19, 2010 to the present; (3) disciplinary actions issued to housekeeping employees from December 1, 2007 to the present; and (4) a list of employees who earned Perfect Attendance Awards from 2007-2009 and the number of days off each employee received per year. Joint Ex. A at 1704-09; Joint Ex. B at GC49.  Minicola denied Mori's request, stating that: (1) Minicola did not have access to anything beyond current departmental work schedules; (2) the daily room assignments were irrelevant because the room requirements had been restored to 15 and 16 rooms per day; (3) it was against Hotel policy to release disciplinary records; and (4) the Hotel did not have access to the 2007 Perfect Attendance Award and would not provide 2008 and 2009 information unless Mori could identify a specific employee about whom he was concerned.  Joint Ex. A at 2630-40.

On December 7, 2010, Respondents provided the Union with all

departmental work schedules from August 29, 2010 to December 4, 2010, but did not provide work schedules from the other requested time periods. *Id.* at 1705-06; Joint Ex. B at GC77. Minicola asserts that he also recently provided additional information to the Union, including (1) six months of work schedules for the Stewards Department on June 28, 2011; (2) six months of work schedules for the Housekeeping Department on September 15, 2011; and (3) documents contained in an employees' file that the Hotel relied upon in terminating two employees on September 15, 2011. Doc. No. 37-1, Minicola Decl. ¶¶ 7, 9.

ii.    Application

There is no dispute between the parties that Respondents must furnish to the Union, upon request, information that is relevant and necessary for the Union to carry out collective bargaining. *See Acme Indus. Co.*, 385 U.S. at 435-36. There is also no dispute between the parties that the information requested by the Union generally falls within the categories of information that must be provided. *See, e.g.*, *Superior Prot., Inc.*, 341 NLRB 267, 269 (2004) ("[I]t is well established that information concerning unit employees' names, addresses, phone numbers, work assignments, and hours is presumptively relevant for purposes of collective bargaining and must be furnished on request."); *Grand Rapids Press*, 331 NLRB 296, 299 (2000) ("[T]he Board has repeatedly held that requested bargaining unit

employee disciplinary records are presumptively relevant and must be furnished on request, unless (the) relevance it rebutted." (citations omitted)); *Leland Stanford Junior Univ.*, 307 NLRB 75, 80 (1992) ("The Board has long held that Section 8(a)(5) of the Act obligates an employer to furnish requested information which is potentially relevant to the processing of grievances. An actual grievance need not be pending nor must the requested information clearly dispose of the grievance.").

It is therefore inexplicable how Respondents could possibly contend that Minicola's explanations were somehow sufficient to excuse Respondents' failure to promptly produce the requested information. For example, as to the daily room assignments and perfect attendance awards, Minicola cannot seriously contend that he need not produce them -- the assignments and awards affect the terms and conditions of employment and Minicola's simple refusal to produce them has no basis in law or fact. And in any event, Minicola's excuse did not hold true -- although Minicola asserted that the daily room assignments were irrelevant because he had restored the requirements to 15 and 16 rooms per day, Minicola unilaterally increased the room assignment assignments on July 1, 2010, less than a month after Mori requested this information.[23] Thus, Minicola's assertion that this

---

[23] Further, even if Minicola had restored the room assignments and never made the unilateral increase, the information is still relevant. Again, Respondents have confused the analysis at hand -- the question is not whether the parties are negotiating a particular term and/or

(continued...)

information was irrelevant is nothing more than an excuse, and a poor one at that.

Nor do any of Minicola's other excuses hold water. As to department work schedules, even if Minicola could not find schedules for prior years, Minicola had a duty to promptly produce work schedules that were available; his production of only some work schedules months after the Union's request without any good reason does not meet Respondents' obligations under the Act. *See West Penn Power Co.*, 339 NLRB 585, 587 (2003) (providing that in determining whether the requested information has been furnished in a timely manner, the Board considers the totality of the circumstances and requires that an employer make a reasonable "good faith effort to respond to the request as promptly as circumstances allow"). As to the disciplinary records, Minicola's generalized and conclusory assertion that their production is against Hotel policy does not carry Respondents' burden of establishing a sufficient reason that rebuts that the Union should be provided this information. *See Grand Rapids Press*, 331 NLRB at 299.

Accordingly, the Board will likely find, and the Ninth Circuit will then affirm, that Respondents violated § 8(a)(5) of the Act by refusing to produce upon the Union's request information relevant to the Union's collective bargaining

---

[23](...continued)
the issue is in dispute; the question is whether the information requested is relevant to the terms and conditions of the employment.

duties.

    b.  *Failure to produce information related to grievance processing*

     i.  Facts

    The Union requested information from the Hotel as part of its investigation of grievances filed on behalf of Hotel employees George Ishikawa ("Ishikawa") and Villanueva, both of whom were terminated.  In both requests, the Union did not receive the majority of the requested information.

    Specifically, as to Ishikawa's termination, Union business agent Karl Lindo ("Lindo") requested information relating to the grievance process via an April 21, 2010 letter, including (1) written or oral forewarning given to Ishikawa of the possible disciplinary consequences of his conduct; (2) investigative notes, reports, statements, and memos relating to Respondents' effort to discover whether Ishikawa violated the rule or policy; (3) names, addresses, and positions of all witnesses to the relevant incident and of all management personnel who made recommendations for or against the disciplinary action; and (4) all prior disciplinary action against Ishikawa.  Joint Ex. B at GC37, pp. 3-4.

    On April 26, 2010, Minicola responded by outlining the Hotel's two-level appeals process of discipline decisions agreed to by Minicola and Mori, which purportedly did not include furnishing information relating to the

employee's discipline decision.  Joint Ex. B at GC38.  Despite additional requests, *see* Joint Exs. B at GC43, GC46, and GC50, Minicola provided only Ishikawa's termination letter.  Joint Ex. A at 2641; Joint Ex. B at GC47.  Minicola asserted that although the Hotel has a general process for disciplining employees, Respondents and the Union had not agreed to a particular grievance procedure and that it was not the Hotel's past practice or procedure to provide copies of documents relating to disciplinary actions such that the Union was not entitled to them.  *Id.* at GC47, p. 1.

On May 28, June 18, July 16, and July 26, 2010, Lindo made similar requests for information relating to a grievance filed on behalf of Villanueva regarding his "written verbal warning" and his subsequent suspension.  Joint Ex. B at GC48, GC53, GC84, and GC85.  The Hotel informed the Union that it would not be responding in writing to any of the submitted grievance forms because there was no recognized grievance procedure.  Joint Ex. A at 2641-43.  Accordingly, the Hotel did not provide any of the requested information in Villanueva's case.  *Id.* When Respondents terminated Villanueva on July 28, 2010, the Union again requested all documents related to Villanueva's suspension and termination.  Joint Ex. B at GC86.  In an August 9, 2010 letter, the Hotel denied the Union's request for information, but provided a copy of Villanueva's termination letter.  Joint Ex.

A at 1715-16; Joint Ex. B at GC87 p. 1.

ii.      Analysis

Even where the parties have not yet reached a collective bargaining agreement, as is the case here, "the Union had a right to request information relevant to its determination of whether Respondent breached existing practices and policies in disciplining [employees], to advise the employees of their rights in the event they were treated disparately, and to otherwise represent these members in an appropriate fashion either through the internal grievance mechanism or otherwise." *See Westside Comm. Mental Health Ctr.*, 327 NLRB 661, 667 (1999). Thus, the Union had a clear right to receive documents regarding Ishikawa's and Villanueva's discipline and termination so that it could determine whether Respondents were following their discipline procedure, advise Ishikawa and Villanueva of their rights, and represent them through the grievance procedure.

Respondents argue that they had no obligation to provide grievance information because there is no collective bargaining agreement in place and as a result, there is no grievance process that the Hotel must undergo with the Union.[24]

---

[24]  Respondents did not timely assert a claim of confidentiality, which, if established, would balance against the relevance of the request for information. *See River Oak Ctr. for Children, Inc.*, 345 NLRB 1335, 1336 (2005) ("[T]he Board balances the union's need for the information against any 'legitimate and substantial' confidentiality interests. The party asserting privacy or confidentiality has the burden of proof, as well as a duty to seek an

(continued...)

Resp't Opp'n at 88-89.  Respondents ignore, however, that Minicola

acknowledged that an in-house grievance procedure exists, explaining in an April

26, 2010 letter:

> We [Minicola and Mori] agreed that the Hotel would
> follow the employee handbook in effect at the time.  The
> procedure provided that the Union could appeal the
> decision first to the Hotel's Human Resource Manager.
> If the Union was dissatisfied with the decision following
> the first level appeal, the Union had a final appeal to the
> Hotel's General Manager.

Joint Ex. B at GC38.  Even though the Hotel and Union have not bargained on and

reached agreement as to a contractual grievance procedure, the Union still

maintains a representational interest in this grievance process such that

Respondents had an obligation to provide grievance information on bargaining unit

employees.  *See Westside Comm. Mental Health Ctr.*, 327 NLRB at 667.

Respondents also argue that the Union is not entitled to witness

statements or investigative reports in light of *Anheuser Busch, Inc.*, 237 NLRB 982

(1978).  *Anheuser Busch, Inc.* held "that the 'general obligation' to honor requests

for information, as set forth in *Acme* and related cases, does not encompass the

duty to furnish witness statements themselves."  237 NLRB at 984-85.  But *New*

_____

[24](...continued)
accommodation.").

*Jersey Bell Telephone Co.*, 300 NLRB 42, 43 (1990), clarified that the duty not to produce statements depends on the context, including whether the witness received assurances of confidentiality, reviewed the statements, or otherwise adopted them, and whether the statement is a verbatim transcript as opposed to work product. In other words, there is no blanket prohibition to producing documents reflecting witness accounts and even if the circumstances of a witness statement suggested an overriding need for confidentiality (which Respondents did not assert), the Union would still be entitled to summaries. *See Penn. Power Co.*, 301 NLRB 1104, 1106 (1991).[25] Respondents did not provide any explanation of how the witness statement exception to production might apply in this case.

The court therefore finds that Respondents have offered no substantiated reason why they had no duty to provide the requested information regarding grievances to the Union. Accordingly, the Board will likely find, and the Ninth Circuit will affirm, that Respondents violated § 8(a)(5) of the Act by

_____

[25] Respondents further argue that in *U.S. Postal Service*, 305 NLRB 997 (1991), the Board held that an employer need not produce the opinions, comments, and recommendations of those who conducted the investigation. Given that it does not appear that the Union requested such information, the court need not address this argument. Further, even if the Union's requests could be read so broadly as to encompass these documents, the court is doubtful that *U.S. Postal Service* applies as broadly as Respondents argue. *U.S. Postal Service* affirmed the ALJ's specific finding that an investigation file created by the Inspection Service of the U.S. Postal Service, which functions solely to conduct audits and criminal and civil investigations, was highly confidential and need not be produced to the Union. 305 NLRB at 1006-07. No such similar facts exist here and Respondents never timely raised an assertion of confidentiality.

refusing to provide grievance-related information upon the Union's request.

### c. *Failure to produce the Hotel's financial information*

#### i. Facts

The March 29, 2010 Injunction ordered Respondents to, among other things:

> resume contract negotiations and honor all tentative
> agreements entered into from the point Respondents and
> the Union, and PBHM and the Union, left off
> negotiations on November 30, 2007, and if an
> understanding is reached, embody such understanding in
> a signed agreement; provided, however, that the parties
> may in good faith reopen negotiations on any tentative
> agreement that has been validly affected by a change in
> economic or other circumstances[.]

*Norelli*, 699 F. Supp. 2d at 1207.

The Hotel subsequently made unilateral changes to the daily housekeeper room requirements, the 401(k) matching contribution arrangement, and the medical plan, which Minicola justified to Mori in a June 24, 2010 meeting by "pleading poverty." Joint Ex. A at 1728-30, 2644-46; *see also* Joint Ex. B at GC31(q) ¶ 34. Mori responded that the Union was not going to discuss any changes until the Hotel provided the Union with financial information. Joint Ex. A at 2646. Thus, in a June 25, 2010 letter, Mori requested that a CPA of the Union's choosing have an opportunity to review Respondent's financial records. Joint Ex.

68

B at GC55, p. 1.  Mori further requested that Respondent provide (1) an

independent auditor's complete financial report covering the company's past two

fiscal years, including balance sheets and statements of operations and cash flow;

(2) corporate income tax returns for the past two fiscal years; (3) interim financial

statements for the current year; and (4) a schedule showing breakdowns of

executive compensation, wages paid to bargaining unit employees and all other

employees in the past two calendar years.  *Id.* at pp. 1-2.

In a June 29, 2010 letter to Mori, Minicola stated that he would send

the Union's CPA the same financial information Respondents sent to the NLRB in

response to an unfair labor practice charge.  *Id.* at GC57.  Because the Union had

no knowledge of what financial information Respondents had sent to the NLRB,

Mori asked that Respondents send the requested information outlined in his June

25, 2010 letter to Union's CPA, Lowell Nagaue ("Nagaue").  *Id.* at GC58.  On July

2, 2010, Minicola requested that Nagaue sign a confidentiality agreement before

releasing any financial information, which Nagaue signed on July 28, 2010.  *Id.* at

GC59 and GC68.

In an August 12, 2010 letter, Nagaue notified Minicola that the only

documents he received were one-page uncertified Statements of Income and Loss

for 2008 and 2009, which Nagaue asserted were insufficient to analyze the

financial conditions of the Hotel.  Joint Ex. A at 2649-50; Joint Ex. B at GC72.

Nagaue therefore asked Minicola to send the financial information previously

requested by Mori.  Joint Ex. A at 2649-50.  After receiving no response from

Respondents, Nagaue sent a follow-up letter to Minicola on August 23, 2010,

requesting the financial information listed in his August 12, 2010 letter.  Joint Ex.

B at GC74.

Minicola admits that he never provided the requested information,

and even told Mori that Respondents would not give any further information.  *See*

Joint Ex. A at 1530-31.  Minicola asserts that he did not respond to Nagaue's

letters and did not send the additional financial information out of concern for

Nagaue keeping the information confidential.  *Id.* at 1529-30.

ii.    Analysis

"The Supreme Court has recognized that a company's refusal to

substantiate a claim of inability to pay can lead to a finding of failure to bargain in

good faith."  *NLRB v. Pac. Grinding Wheel Co.*, 572 F.2d 1343, 1348 (9th Cir.

1978) (citing *Truitt Mfg. Co.*, 351 U.S. at 153).  Whether an employer has failed to

bargain in good faith by refusing to provide documents substantiating a plea of

poverty "turn[s] upon its particular facts.  The inquiry must always be whether or

not under the circumstances of the particular case the statutory obligation to

bargain in good faith has been met." *Truitt Mfg. Co.*, 351 U.S. at 153-54.

Applying these principles, the particular facts of this case establish that Respondents plainly violated § 8(a)(5) of the Act by refusing to provide Nagaue necessary documents to substantiate their claim of poverty. Specifically, Respondents were required to resume contract negotiations and honor all tentative agreements since leaving negotiations on November 30, 2007, and only reopen negotiations if a tentative agreement had been *validly* affected by a change in economic circumstances. Respondents attempted to justify several unilateral changes on the basis of a change in economic circumstances, but refused to provide Nagaue anything beyond the most general uncertified Statements of Income and Loss for 2008 and 2009. As Nagaue testified, this information was insufficient for him to render *any* opinion as to the financial condition of the Hotel because, among other reasons, expenses were grouped in general categories preventing Nagaue from determining whether there were any significant changes over the two years, there was no balance sheet from which Nagaue could compare assets and liabilities to determine ability to pay debts, and the statements were not certified such that Nagaue had no confidence in the correctness of the Statements and had no way to verify the numbers. Joint Ex. A, at 1939-43. And the Board has rejected that uncertified financial statements are sufficient to meet an employer's burden to

produce financial information.  *See, e.g.*, *R.E.C. Corp.*, 307 NLRB 330, 333 (1992)

("Indeed even absent such evidence of financial 'looseness' of employers,

uncertified financial statements have not been deemed sufficient to meet the

employers' obligations under *Truitt*."); *Am. Model & Pattern*, 277 NLRB 176, 184

(1985) ("Respondent, in order to satisfy its duty to bargain in good faith, was under

a clear obligation to produce, for inspection and analysis, any and all books and

records available to it which would tend to support its bargaining position.");

*Tony's Meats, Inc.*, 211 NLRB 625, 626 (1974) (holding that an employer must

permit CPA to examine employer's records).

   Although Respondents argued before ALJ McCarrick that they need

not produce the documents due to confidentiality concerns, Respondents have not

articulated any similar argument to this court why disclosure of their financial

information must be limited.[26]  Rather, in opposition, Respondents acknowledge

their duty to provide the Union financial information, but assert that under *Albany*

*Garage, Inc*., 126 NLRB 417 (1960), the information provided was sufficient.  The

court disagrees.

---

[26]  Respondents forego this argument of confidentiality for good reason -- ALJ McCarrick
correctly explained that Respondents have the burden to establish the need to limit disclosure,
*HTH Corp.*, 2011 WL 4073681, Doc. No. 36-1 at 34-35 (citing *R.E.C. Corp.*, 307 NLRB 330,
333 (1992)), and Respondents offered no compelling evidence that would support limiting
disclosure.

In *Albany Garage*, the union requested wage increases, and in response, the employer asserted inability to pay and therefore provided the union a financial statement including a comparative sales and profit report for the year. *Id.* at 431-32. *Albany Garage* held that the employer did not violate the Act when it refused the union's subsequent request that auditors be given access to company records and that an independent arbitrator would determine whether the employer could afford the wage increase. *Albany Garage* reasoned that (1) the request for auditor access and subsequent arbitration was unreasonable on its face given the parties' previous negotiations; (2) the union did not articulate what could be determined from an examination of the employer's books; (3) the financial information provided satisfied the employer's bank, mortgagee, and the tax authorities; and (4) the employer had previously given this same type of financial information to the union in prior years. *Id.* at 432. Unlike *Albany George*, (1) the accuracy of the financial information is in question because the Statements are not certified; (2) Respondents have presented no evidence that the Statements are sufficient in other contexts (such as to satisfy banks and/or tax authorities); and (3) the Union never previously accepted such general financial information from the Hotel. Further, although Minicola asserts that he provided similar information to the Union regarding a different employer, such a naked assertion does not carry

Respondents' burden where Minicola does not explain the precise information that was provided and the circumstances of the production.

In sum, Respondents have failed to establish a basis to limit their disclosure of financial information to Nagaue such that the Board will likely find, and the Ninth Circuit will then affirm, that Respondents violated § 8(a)(5) of the Act by refusing to provide the requested financial information.

## B.      Irreparable Harm

"[A] district court cannot grant an injunction unless the Director has shown that irreparable harm is 'likely'; the 'possibility' of harm is insufficient to meet the Director's burden." *Small*, 2011 WL 5120538, at *7. "In the context of the NLRA, 'permit[ting an] alleged unfair labor practice to reach fruition and thereby render meaningless the Board's remedial authority is irreparable harm.'" *Frankl*, 650 F.3d at 1362 (quoting *Small v. Operative Plasterers' & Cement Masons' Int'l Ass'n, Local 200*, 611 F.3d 483, 491 (9th Cir. 2010)). Although the court may not presume that irreparable harm flows from an unfair labor practice generally, "irreparable injury is established if a likely unfair labor practice is shown along with a present or impending deleterious effect of the likely unfair labor practice that would likely not be cured by later relief. In making the latter determination, inferences from the nature of the particular unfair labor practice at

issue remain available." *Id.*

As explained above, Petitioner has shown a strong likelihood of success in establishing that Respondents violated various provisions of the NLRA by (1) disciplining and terminating Villanueva because of his Union activity; (2) making unilateral changes of increasing the housekeeping room assignments and by banning Mori and Labtingao from Hotel premises; and (3) refusing to produce to the Union documents and information that are relevant and necessary for the Union to perform its duties. These violations, falling fast on the footsteps of the March 29, 2010 Injunction, are only the latest in what has been a concerted and continuous effort by Respondents to eliminate Union representation at the Hotel. Left unchecked, Respondents' violations of the Act have already caused, and will continue to cause, irreparable harm to the Union and Hotel employees that cannot be adequately remedied by the Board.

As to Villanueva, Petitioner has established a likelihood of success in establishing that Villanueva's discharge violated §§ 8(a)(1) and 8(a)(3) of the Act prohibiting employers from interfering with employees in the exercise of their collective bargaining rights, and from discriminating in regard to tenure of employment to discourage membership in a labor organization, respectively. 29 U.S.C. §§ 158(a)(1) & (a)(3). This is now the second time that Respondents have

terminated him due to his Union activity, and "the discharge of active and open union supporters risks a serious adverse impact on employee interest in unionization and can create irreparable harm to the collective bargaining process." *Frankl*, 650 F.3d at 1363 (quoting *Pye v. Excel Case Ready*, 238 F.3d 69, 74 (1st Cir. 2001)); *see also Blyer v. P&W Elec., Inc.*, 141 F. Supp. 2d 326, 330 (E.D.N.Y. 2001) (finding reinstatement appropriate to prevent risk of chilling union efforts). It is for this very reason that "a likelihood of success as to a § 8(a)(3) violation with regard to union activists that occurred during contract negotiations or an organizing drive largely establishes likely irreparable harm, absent unusual circumstances." *Frankl*, 650 F.3d at 1363.

As this court previously found, the Union had lost open employee support because employees are scared of losing their jobs and facing reprisals, *see Norelli*, 699 F. Supp. 2d at 1202, and Villanueva's termination for a second time only reinforces the message that the Hotel will take action against Union supporters. Indeed, some Hotel employees are afraid to talk about the Union at the Hotel or give statements to the NLRB, and attendance of core committee members at negotiating meetings has diminished. *See* Pet'r Ex. D at 3-4. This "chilling effect" on the Union and "fear of employer retaliation after the firing of union supporters is exactly the 'irreparable harm' contemplated by § 10(j)." *Pye*, 238

F.3d at 75 (citing *Asseo v. Centro Medico Del Turabo*, 900 F.2d 445, 454 (1st Cir. 1990)). Petitioner confirmed at the October 31, 2011 hearing that Villanueva wishes to return to the Hotel, and his return will help to reverse the chilling effect that his unlawful termination caused.

As to Respondents' unilateral changes and refusals to provide requested information, "a finding of likelihood of success as to a § 8(a)(5) bad-faith bargaining violation in particular, along with permissible inferences regarding the likely effects of that violation, can demonstrate the likelihood of irreparable injury, absent some unusual circumstance indicating that union support is not being affected or that bargaining could resume without detriment as easily later as now." *Frankl*, 650 F.3d at 1363. Such violations cause irreparable harm by decreasing union support over time -- "an unremedied refusal to bargain with a union, standing alone, is to discredit the organization in the eyes of the employees, to drive them to a second choice, or to persuade them to abandon collective bargaining altogether." *Id.* at 1362 (quoting *Karp Metal Prods. Co.*, 51 NLRB 621, 624 (1943)); *see also Small*, 2011 WL 5120538, at *8 ("[A] delay in bargaining weakens support for the union, and a Board order cannot remedy this diminished level of support."); *NLRB v. Hardesty Co.*, 308 F.3d 859, 865 (8th Cir. 2002) (stating that violations of § 8(a)(5) of the Act "send the message to the

employees that their union is ineffectual, impotent, and unable to effectively represent them"); *Morio v. N. Am. Soccer League*, 632 F.2d 217, 218 (2d Cir. 1980) (revoking certain unilateral changes in employment conditions based upon a finding that the union's prestige and legitimacy with its members had been severely eroded by the respondent's conduct, which included unilateral changes).

Respondents' unilateral changes send the clear message to employees that the Union is ineffectual and unable to represent them, and will certainly erode Union support and cause employees to "drift away" from the Union. *See Hardesty Co.*, 308 F.3d at 865; *Brown ex. rel. NLRB v. Pac. Tel. & Tel. Co.*, 218 F.2d 542, 544 (9th Cir. 1954) ("In view of the irreparable harm which the designated unions may suffer by the drifting away of their members . . . we think the law entitles the Board to the injunctive relief sought."). This is especially the case with regard to Respondents' change to the housekeeping room assignment requirements. Only three months after the March 29, 2010 Injunction required Respondents to rescind unilateral changes upon the Union's request -- including a unilateral increase in the Hotel room assignment requirements -- Respondents nonetheless reinstated this increase once again. Beyond evidencing a clear lack of respect for their

obligations pursuant to court order,[27] Respondents' quick about-face sends the message that Respondents can do as they please, and undermines any credibility and support that the Union developed with its employees over this time.

      As to Respondents' refusals to provide requested information, withholding such information would impair the Union's ability to bargain with Respondents while the appeal proceeds before the Board.  Losing this opportunity to bargain during the appeal harms the Union and employees because it is a lost opportunity that the Union cannot simply regain after a Board decision.  *See Small*, 2011 WL 5120538, at *7 ([A] failure to bargain eliminates the possibility that the union and employer will negotiate a collective bargaining agreement as long as that failure continues.  Therefore, without bargaining, employees are denied the opportunity to achieve the economic benefits that a CBA can secure for workers.");  *Norelli v. SFO Good-Nite Inn*, 2007 WL 662477, at *14 (N.D. Cal. Mar. 1, 2007) (finding irreparable harm because Respondent's conduct would, among other things, make "it difficult to preserve the collective bargaining process"); *Rivera-Vega v. ConAgra, Inc.*, 876 F. Supp. 1350, 1371 (D. P.R. 1995) (finding that

---

[27]  Although Minicola testified that he does not recall making such statement, *see* Joint Ex. A at 2662-63, Mori testified that when he told Minicola that increasing the room requirements would be a violation of the March 29, 2010 Injunction, Minicola allegedly responded with something along the lines of "fuck the judge, he's wrong," *id.* at 1729, and that his actions were not illegal unless he went to jail.  *Id.* at 1737.

Respondents must produce documents requested by the Union because "[u]nless Respondents are promptly ordered to bargain in good faith on an interim basis, the effectiveness of a Board order in due course will be greatly diminished"). Injunctive relief is particularly necessary in this case where Respondents have pled poverty as a reason supporting various unilateral changes; without Nagaue reviewing Respondents' financial information, the Union has no way of evaluating such assertion and bargaining effectively with the Union. Further, without grievance information, the Union will not be able to properly represent employees in investigating grievances, eroding the Union's ability to represent its employees and creating employee dissatisfaction with the Union.[28]

Respondents' assertions that the Union and Hotel employees will suffer no harm lack merit. For example, as to Villanueva, Respondents argue that whether Villanueva will suffer harm is not the relevant inquiry because the focus for a 10(j) injunction is not on the individual employee, but rather the harm to the bargaining process. But as explained above, Respondents' termination of Villanueva harms the overall bargaining process by chilling Union support. As to the unilateral change of Hotel room assignments, Respondents argue that

---

[28] Beyond the arguments addressed above, Petitioner also argues that the passage of time since the violations occurred does not render injunctive relief inappropriate. *See* Pet'r Br. at 95. Respondents do not argue to the contrary, and the court agrees that Petitioner timely brought this Petition such that the court can provide meaningful injunctive relief.

injunctive relief is not necessary because the original room assignment requirements have been restored.  Such argument, however, ignores Respondents' shenanigans of previously asserting, incorrectly, that the requirements were restored.  Injunctive relief will therefore make clear that the room assignment requirements must be restored and preclude Minicola, once again, from making unfounded and unilateral changes.  As to banning Mori and Labtingao, Respondents assert that injunctive relief is not necessary given that other Union officials have access to the Hotel property and Mori and Labtingao can meet with Hotel employees off site.  The court rejects this argument -- Respondents sent an unmistakable message to Hotel employees that the Union was not welcome by publicly posting that Mori and Labtingao were banned.  Allowing these individuals access to the Hotel will help to undo the chilling effect Respondents' unilateral action had on the Union and Hotel employees.  Finally, as to information requests, Respondents assert that they have provided some information (some work assignment information), other information need not be provided because Respondents have not done anything wrong (room assignment requests and perfect attendance awards), and Nagaue has sufficient financial information. Respondents' myopic view of their duties to provide information ignores that the Union has a right to this information and it is necessary for effective bargaining.

In sum, the court finds that the Union and employees will suffer irreparable harm if the court does not order Respondents to reinstate Villanueva, rescind unilateral changes, and provide requested information to the Union.

## C.    Balance of Hardships

"[I]n considering the balance of hardships, the district court must take into account the probability that declining to issue the injunction will permit the alleged[] unfair labor practices to reach fruition and thereby render meaningless the Board's remedial authority." *Frankl*, 650 F.3d at 1365 (quoting *Miller*, 19 F.3d at 460).

The hardships that the Union and Hotel employees will face without injunctive relief are the same as the irreparable injuries discussed above -- without an injunction, all of Respondents' myriad unfair labor practices will likely cause damage that the Board cannot simply undo.  In comparison, Respondents will be required to do what the law required them to do in the first instance.  As such, the Hotel faces little hardship. *See Small*, 2011 WL 5120538, at *11 ("When '[t]he company is not compelled to do anything except bargain in good faith,' the risk from a bargaining order is 'minimal.'" (quoting *Dunn*, 241 F.3d at 667)).

In opposition, Respondents actually assert that they, and not the Union and the Hotel employees, will suffer irreparable harm.  This argument relies on a

dubious version of events. Specifically, Respondents assert that they will suffer irreparable harm if forced to (1) rehire Villanueva in light of his "deceitful or surreptitious behavior;" or (2) allow Union officials access to the Hotel where they harass employees and disrupt operations. Resp't Opp'n at 101. Respondents ignore, however, that ALJ McCarrick made specific credibility determinations against Respondents' version of events on both these points. Accordingly, the court finds that this factor weighs in favor of Petitioner.

## D.    Public Interest

"In § 10(j) cases, the public interest is to ensure that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge." *Frankl*, 650 F.3d at 1365 (quoting *Miller*, 19 F.3d at 460). "Thus, courts must consider the extent to which this interest is implicated under the circumstances of the particular case." *Miller*, 19 F.3d at 460. "Moreover, the public interest favors applying federal law correctly." *Small*, 2011 WL 5120538, at \*12. Where "the Director makes a strong showing of likelihood of success and of likelihood of irreparable harm, the Director will have established that preliminary relief is in the public interest." *Frankl*, 650 F.3d at 1365.

Applied here, Petitioner has made a strong showing on both likelihood of success and irreparable harm such that preliminary relief is in the public interest.

In opposition, Respondents nonetheless argue that an injunction is not in the public

interest because the issues presented are within the administrative expertise of the

Board and Petitioner is essentially seeking the same remedy it would receive from

the Board. Respondents' argument is spurious. Accepting Respondents' argument

would mean that this court should almost never enter injunctive relief on a 10(j)

petition. Indeed, Respondents cite no authority for their remarkable proposition.

Rather, as the Ninth Circuit recently explained, "even if the Board subsequently

orders a bargaining remedy, the union is likely weakened in the interim, and it will

be difficult to recreate the original status quo with the same relative position of the

bargaining parties. That difficulty will increase as time goes on." *Frankl*, 650

F.3d at 1363; *see also Small*, 2011 WL 5120538, at *13 ("[I]t is illogical to suggest

that the grant of an injunction in the circumstances contemplated by the statute

infringes on the NLRB's authority as delineated by that statute. . . . We reject this

argument as clearly contrary to well established law."). An injunction is in the

public interest for all the reasons described above.

**E.      Scope of Appropriate Relief**

At the conclusion of the October 31, 2011 hearing, the court ordered

the parties to meet and confer regarding the scope of an injunction, without

prejudice to any objection by Respondents to the court's overall determination that

injunctive relief should be granted.  The parties were able to find agreement on almost all terms of an injunction except for one.  *See* Doc. No. 46.  The court therefore addresses the one issue on which the parties could not agree.

Petitioner requests that the court require Respondents, within ten days of the date of this Order, convene the bargaining unit employees during working time at the Hotel in the presence of Chief Executive Officer Corine Watanabe ("Watanabe"), President John Hayashi ("Hayashi"), and Minicola, where either Watanabe or Hayashi will publicly read the Injunction.  Petitioner asserts that this relief is necessary because Minicola previously read the March 29, 2010 Injunction and such reading had little effect given that Respondents almost immediately fell back into their practices of violating the Act.  Petitioner further asserts that this relief is similar to the relief recommended by ALJ McCarrick for a Board cease and desist order.  In opposition, Respondents argue that Petitioner did not request in the Petition for Injunction that Watanabe or Hayashi read the Injunction, there is no evidence that they were personally involved in the violations of the Act, and they were not individually named as parties in this proceeding.  Respondents further note that ALJ McCarrick did not recommend that Watanabe and/or Hayashi read the order, but instead gave the option of either having either of them read the order or be present when Minicola reads the order.

The court finds that Petitioner has the better argument. Respondents have engaged in systematic violations of the Act over the last decade, and numerous Board decisions and this court's March 29, 2010 Injunction have failed to rein in Respondents' practices. Minicola -- both through his actions and words -- has expressed a deep disrespect of both the Union and the law, and has been Respondents' main actor responsible for the NLRA violations. Requiring Watanabe, Hayashi, and Minicola to be present while either Watanabe or Hayashi reads the Injunction in front the collective bargaining employees will send the message that Respondents will now (finally) obey the law. Although Petitioner did not ask for this specific relief, Petitioner did request that the Injunction be read by "a responsible management official," which includes both Watanabe and Hayashi, and these individuals, as officers of Respondents, as bound by the Injunction. Respondents may use their discretion in determining whether Hayashi or Watanabe reads the Injunction.

Accordingly, pending final disposition of the matters pending before the Board, the court ORDERS that:

1.     Respondents HTH Corp., Pacific Beach Corp., and Koa Management, LLC  d/b/a/ the Pacific Beach Hotel cease and desist from:

    (a)     discharging employees in order to discourage Union activities and membership;

(b) failing and refusing to recognize and bargain in good faith with the Union by changing the terms and conditions of employment of bargaining unit employees without first giving notice to, and bargaining with, the Union;

(c) refusing to bargain collectively with the Union by failing and refusing to furnish it with requested information that is relevant and necessary to the Union's performance of its functions as the collective-bargaining representative of Respondents' employees; and

(d) in any other manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the National Labor Relations Act.

2. Respondents HTH Corp., Pacific Beach Corp., and Koa Management, LLC d/b/a/ the Pacific Beach Hotel take the following affirmative steps:

(a) within five (5) days of the issuance of this Order, offer, in writing, immediate interim reinstatement to Rhandy Villanueva to his former job position, or if that position no longer exists, to a substantially equivalent position without prejudice to his seniority or any rights and privileges previously enjoyed, displacing, if necessary, any workers hired or reassigned to replace him;

(b) immediately rescind, at the Union's request, the unilateral changes to bargaining-unit employees' terms and conditions of employment, by lifting the ban of Dave Mori and Carmelita Labtingao and by allowing their access to the Hotel's premises pursuant to the parties' 2005 or 2006 agreement regarding access, and by restoring housekeepers' daily room assignments to 15 rooms in the Beach Tower, and 16 rooms in the Ocean Tower;

(c) within ten (10) days of the issuance of this court Order, furnish to the Union the following information:

(1)    information requested in the Union's June 8, 2010 letter, including:

    (a)    disciplinary actions issued by Respondents to housekeeping employees from December 1, 2007 to the present;

    (b)    daily room assignments for housekeeping employees from April 19, 2010 until the present;

    (c)    list of employees who earned perfect attendance awards in 2007, 2008, and 2009 and the number of days off each employee received per year; and

    (d)    all department work schedules from December 1, 2007 until the present;

(2)    information specified in the Union's requests for information dated June 8, 2010 (Petitioner's Exhibit B, paragraph 12), pertaining to disciplinary action taken by Respondents against employee George Ishikawa;

(3)    information specified in the Union's requests for information dated May 28, June 18, July 16, July 26, and August 6, 2010 (Petitioner's Exhibit B, paragraphs 13 and 14), pertaining to disciplinary action taken by Respondents against employee Rhandy Villanueva; and

(4)    information specified in the Union's certified public accountant's requests for information dated August 12 and August 23, 2010 (Petitioner's Exhibit B, paragraph 15);

(d)    post copies of this Order and the Order entitled "Injunctive Relief Pursuant to 29 U.S.C. § 160(j)" at the Pacific Beach Hotel in all places where notices to employees are normally posted; maintain these postings during the National Labor Relations Board's administrative proceeding free from all

obstructions and defacements; grant all employees free and unrestricted access to said postings; and grant to agents of the National Labor Relations Board reasonable access to the Pacific Beach Hotel to monitor compliance with this posting requirement;

(e)     within ten (10) days of the date of this Order, convene the bargaining unit employees during working time at the Employer's facility, by shifts, where CEO Corine Watanabe, President John Hayashi, and Robert Minicola shall be present, and either CEO Corine Watanabe or President John Hayashi shall publicly read, in the presence of a National Labor Relations Board Agent, the court's separate-entered Order entitled "Injunctive Relief Pursuant to 29 U.S.C. § 160(j);" and

(f)     within twenty (20) days of the issuance of this Order, file with the court and serve upon the Regional Director of Region 20 of the Board, a sworn affidavit from a responsible official describing with specificity the manner in which Respondents have complied with the terms of the District Court's decree, including the locations of the posted documents.

## V.  <u>CONCLUSION</u>

In sum, the court finds that Petitioner has carried its burden of showing that the likelihood of success on the merits, irreparable harm, the balance of hardships, and the public interest all weigh in favor of the court granting injunctive relief.  The court therefore GRANTS the Petition for Injunction Relief

*///*

*///*

*///*

as stated in this Order.  The Clerk of Court is ordered to close this action.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, November 21, 2011.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Frankl v. HTH Corp et al.*, Civ. No. 11-00451 JMS/RLP, Order Granting the Petition for Injunction under Section 10(j) of the National Labor Relations Act